ITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————X
                                                    :
EMMANUEL COOPER,                                    :
                                                    :
                              Plaintiff,            :
                                                    :               ___ CV ____
           -against-                                :
                                                    :               (Jury Demanded)
THE CITY OF NEW YORK; THE NEW YORK CITY             :
TRANSIT AUTHORITY; New York City Transit            :
Authority Police Detective JAMES E. YOUNG; New      :
York City Transit Authority Police Detective CARTER;:
New York City Transit Authority Police Detective    :
JEREMIAH LYONS; New York City Police Department     :
Detective JACK CUTRONE; New York City Police        :
Department Detective HUGH AGAR; and New York        :
City Police Department Detective TARTAGLIA,         :
                                                    :
                              Defendants.           :
                                                    :
———————————————————————X

---

**COMPLAINT**

---

THOMAS HOFFMAN, ESQ.
Law Offices of Thomas Hoffman, P.C.
37 Elaine Terrace
Yonkers, New York 10701-5257
Office: (212) 581-1180
Cell: (917) 589-6156
Email: thoff93452@aol.com

*Attorney for Emmanuelle Cooper*

# TABLE OF CONTENTS

NATURE OF ACTION ……………………………………………………… 1

JURISDICTION, VENUE & CONDITIONS PRECEDENT ……………………… 7

THE PARTIES ……………………………………………………….. 7

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION …………………….. 9

A.    The Crime ……………………………………………… 9

B.    Detectives Manufacture Evidence To Arrest Cooper For The Murder ……………… 13

      1.    Detectives Coerce Crack Addict Rico Sanchez
Into Falsely Identifying Cooper ……………………………… 14

      2.    Detectives Manufacture Thomas Volino's False Identification Of
Cooper, And Use It As A Basis To Have Cooper Placed In A Lineup .. 18

      3.    Detectives Threaten Russell Bratton That He Would Be Charged
With The Murder If He Did Not Cooperate, And Use Inherently
Improper Tactics To Coerce Him Into Identifying Cooper …………… 19

C.    Cooper Is Arrested And Indicted …………………………………… 21

D.    The District Attorney's Misconduct Prior To Trial ………………………… 23

E.    The District Attorney's Misconduct During Cooper's Trial ………………… 25

      1.    The *Wade* Hearing ………………………………… 25

      2.    Rico Sanchez's Trial Testimony ………………………… 28

      3.    Russell Bratton's Trial Testimony ……………………… 32

      4.    Elaine Terry's Trial Testimony ………………………... 33

F.    Cooper's Alibi Defense …………………………………...……… 33

G.    The KCDA's 27-Year Cover-Up Of The Misconduct In Cooper's Case …………… 33

      1.      Cooper's Appeals …………………………………..………… 33

      2.      Cooper's Freedom Of Information Law Requests …………..….. 35

           i.      The Law Regarding The FOIL ……………………….. 35

           ii.      Cooper's FOIL Requests …………………………… 36

           iii.     The Documents Wrongfully Withheld ……………… 37

H.     Twenty-Seven Years After Cooper Is Convicted, A New Attorney On His Case
Uncovers The KCDA's Fraud, And The KCDA Then Agrees To Have
Cooper's Conviction Vacated …………………………………………… 38

I.      After Cooper's Conviction Is Vacated, The KCDA Continues To Suppress *Brady*
Material …………………..……………………………………………… 40

J.      Cooper's Damages And Injuries …………………………………………… 42

FIRST CAUSE OF ACTION
(Wrongful Arrest And Detention Under The Fourth  Amendment and *Manuel v.
City of Joliet*, 137 S.Ct. 911 (2017); 42 U.S. C. § 1983; YOUNG, CARTER,
CUTRONE, LYONS, CITY, and NYCTA) ……………………………………… 39

SECOND CAUSE OF ACTION
(Malicious Prosecution and Deprivation of Liberty Under the Fourth,
Fifth, Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983; YOUNG,
CARTER, CUTRONE, LYONS, CITY, and NYCTA) …………………………….. 44

THIRD CAUSE OF ACTION
(Evidence Manufacturing; Denial of A Fair Trial Under The Fifth,
Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983;  YOUNG,
CARTER, CUTRONE, LYONS, CITY, and NYCTA) ……………………………… 47

FOURTH CAUSE OF ACTION
(Suppression of *Brady v. Maryland*, 373 U.S. 83 (1963) and Denial Of
A Fair Trial Under The Fifth, Sixth, Fourteenth Amendments; YOUNG,
CARTER, CUTRONE, LYONS, CITY, and NYCTA) ……………………………… 49

FIFTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on the KCDA's
unconstitutional policies, customs, and practices, and failure to supervise,
discipline, and rectify amounting to deliberate indifference) ………………………… 52

SIXTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983 Claim Against the CITY Based On the KCDA's Post-
Conviction Policy And Custom Of Covering-Up Trial Prosecutors' Suppression
Of *Brady/Giglio* Material) …………………………………………………….    72

SEVENTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on the conduct of
the NYPD) …………………………………………………………………..    82

EIGHTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983 Claim Against the NYCTA based on conduct of the
NYCTAPD) …………………………………………………………………    89

NINTH CAUSE OF ACTION
(42 U.S.C. §1983 Civil Conspiracy, Concerted Action, Aiding and Abetting;
YOUNG, CARTER, CUTRONE, LYONS, and the CITY) ………………………    94

TENTH CAUSE OF ACTION
(Malicious Prosecution Under New York Law; YOUNG, CARTER, CUTRONE,
LYONS, CITY, and NYCTA) …………………………………………………..    96

ELEVENTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress Under New York Law; YOUNG,
CUTRONE, CARTER, and LYONS, CITY, and NYCTA) ………………………..    97

TWELFTH CAUSE OF ACTION
(False Arrest Under New York Law; YOUNG, CARTER, CUTRONE, and LYONS,
CITY, and NYCTA) …………………………………………………………    98

THIRTEENTH CAUSE OF ACTION
(Negligent Training and Supervision, and Discipline Under New York Law; CITY
and NYCTA) …………………………………………………………………    98

FOURTEENTH CAUSE OF ACTION
(New York State Constitutional Due Process Claim Against The CITY and NYCTA
Pursuant To Respondent Superior; *Buari v. City of New York*, 2021 WL 1198371
(S.D.N.Y. 2021)) …………………………………………………………..    99

DAMAGES DEMAND ……………………………………………………….. 100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
—————————————————————————————X
                                  :

EMMANUEL COOPER,                      :

                       :        **COMPLAINT**

            Plaintiff,        :

                       :        ___ CV ____

        -against-           :

                       :        (Jury Trial Demanded)

THE CITY OF NEW YORK; THE NEW YORK CITY  :
TRANSIT AUTHORITY; New York City Transit  :
Authority Police Detective JAMES E. YOUNG; New  :
York City Transit Authority Police Detective CARTER;  :
New York City Transit Authority Police Detective  :
JEREMIAH LYONS; New York City Police Department  :
Detective JACK CUTRONE; New York City Police  :
Department Detective HUGH AGAR; and New York City  :
Police Department Detective TARTAGLIA,  :

                       :

           Defendants.     :

                       :
—————————————————————————————X

      EMMANUEL COOPER, by his attorney THOMAS HOFFMAN, ESQ., complaining of

the defendants, respectfully alleges, upon information and belief, as follows:

**NATURE OF ACTION**

      1.     This civil rights action under 42 U.S.C. §§ 1983 and 1988, and New York law,

arises from the wrongful arrest, prosecution, and conviction of Emmanuel Cooper, an innocent

man whose life was destroyed by police and prosecutors who framed him for a murder he did not

commit, and caused him to spend nearly 28 years of his life in prison.

      2.     On January 8, 2020, the Kings County District Attorney's Office ("KCDA"),

confronted with overwhelming proof that Cooper's conviction was obtained by concealment of

exculpatory evidence and the use of false testimony and argument, joined in his motion to vacate

his conviction and agreed to his immediate release from prison.

3. The KCDA conceded one of its prosecutors suppressed exculpatory evidence that decimated the credibility of the key witness against Cooper, elicited false testimony, and made false arguments to the court and jury.

4. In addition to that misconduct, after Cooper's conviction was vacated, the KCDA revealed for the first time that within hours of the crime, two eyewitnesses had independently identified someone other than Cooper as the perpetrator. One of those eyewitnesses actually gave police the real perpetrator's name and the location where he could be found.

5. Not only was this evidence suppressed throughout Cooper's trial, but for 27 years the KCDA denied the evidence existed every time Cooper sought it through numerous Freedom of Information Law requests he made to the KCDA after he was convicted.

6. On November 9, 2020, the KCDA moved to dismiss Cooper's indictment, acknowledging there was insufficient evidence to retry him.

7. This lawsuit seeks to hold those responsible for this catastrophic injustice accountable. Cooper's lawsuit names six detectives —three from the New York City Police Department ("NYPD") and three from the New York City Transit Authority ("NYCTA") Police Department— who manufactured evidence against him, coerced witnesses into falsely incriminating him, and suppressed exculpatory evidence from prosecutors.

8. Cooper's lawsuit also names the City of New York and the NYCTA as defendants as their employees' misconduct, and the subsequent 27-year cover-up of it, was substantially caused by the City's and NYCTA's (a) policies, customs, and practices, (b) deliberate indifference to the likelihood that constitutional violations like the ones Cooper suffered would occur, and (c) the failure to supervise and discipline employees who committed such misconduct,

notwithstanding that such misconduct was rampant throughout those agencies at the time Cooper was arrested, prosecuted, and convicted.

9. As to the City, in 1992-1993 both the NYPD and KCDA, as a matter of policy and custom, coerced witnesses to give false or unreliable testimony through their powers of arrest and interrogation, misused *Damiani* or take-out orders,[1] unlawfully concealed exculpatory or impeachment evidence known as "*Brady/Giglio*" material, and lied to or misled courts, defense attorneys, and others to cover-up that unlawful behavior. *See e.g. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department* (establishing that police officer use of false evidence and perjury were "endemic" in the NYPD during 1992-1993, when Cooper was arrested, prosecuted, and convicted); Kings County District Attorney's Office, *426 Years: An Examination of 25 Wrongful Convictions in Brooklyn*, New York, July 9, 2020, p. 14 (KCDA admitting that in 1992-1993, the use of false evidence and suppression of *Brady* material were institutional failures of the KCDA administration, and resulted in scores of wrongful convictions). Current DA Eric Gonzalez acknowledged that 83% of the 25 wrongful convictions detailed in that report were caused by prosecutorial misconduct.

10. In cases where such misconduct was exposed, NYPD and KCDA policymakers failed to meaningfully investigate the conduct or whitewashed it, took no disciplinary action against the offending employees, and instead praised and promoted them, thereby encouraging future constitutional violations to occur. Those policymakers were deliberately indifferent to the misconduct despite abundant evidence that NYPD officers and KCDA prosecutors suppressed

_____

[1] A *Damiani* or take-out order is a court order allowing the KCDA to take custody of an inmate from prison and bring him or her to the KCDA's Office for questioning, provided the inmate consents to that production. *See People v. Jackson*, 65 N.Y.2d 265, 267 n.1 (1985).

*Brady* material and used false or misleading evidence that violated the constitutional rights of defendants.

11.     Additionally, the KCDA under former District Attorney Charles J. Hynes, maintained several affirmative, unconstitutional policies that led the trial prosecutor in Cooper's case to conceal *Brady* material, and other prosecutors to continue to cover it up after Cooper was convicted.

12.     As established by KCDA internal records and sworn testimony from several KCDA prosecutors, the Hynes administration would, as a matter of policy:

(a)     Withhold prosecution witnesses' pretrial recantations if prosecutors disbelieved, or at least claimed to disbelieve, the recantations, a blatant violation of the *Brady* rule which requires any *objectively* favorable information to be disclosed to the defense.[2]  *See* Deposition of Theresa Corrigan in *Zahery v. City of New York,* 98 CV 4546 (LTS) (testifying to this longstanding KCDA pretrial recantation policy);

(b)     Improperly obtain and abuse *Damiani* orders to coerce defenseless inmates into testifying against criminal defendants by:

    i.     Submitting affirmations to the court purporting to have been affirmed and signed by prosecutors but which, in truth, were signed by paralegals in the office,

    ii.     Falsely representing in those affirmations that *the inmates* asked to speak to the KCDA when, in truth, they had not and the prosecutors were unilaterally having them produced to the KCDA to interrogate them,

---

[2] *See e.g. Strickler v. Greene*, 527 U.S. 263, 282 n. 21 (1999) ("Our cases make clear that *Brady*'s disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness."); *People v. Robinson*, 133 A.D.2d 859, 860 (2d Dep't 1987) ("Even if the prosecution had valid reasons to consider this witness to be unreliable, it should nonetheless have provided the defense with [the witness' statement] which was clearly *Brady* material.")

<ol type="i" start="3">
<li>Representing to the court that the inmates would not be produced to the KCDA unless they consented in writing, but failing to honor that promise or ensure that the inmates consented to their production, and produce those inmates against their will and without their consent, and</li>
<li>Suppressing all of this from the defendants these coerced inmates testified against;[3]</li>
</ol>

<ol type="a" start="3">
<li>Intentionally limit its search for records responsive to defendants' post-conviction FOIL requests for *Brady* material to the defendants' trial files, even though the KCDA maintained *Brady* material in several other files within the office (*e.g.* Detective-Investigator's Squad, Victim's Services Unit, Witness Relocation Unit, and Fiscal Office). *See* Deposition of KCDA ADA Morgan J. Dennehy in *Collins v. City of New York*, 11 CV 766 (FB) (RML), pp. 44-45, 56, 107 (admitting to the existence of this policy at the time Cooper made his FOIL requests to the KCDA). This practice was declared illegal long before the KCDA used it to deny Cooper's post-conviction FOIL requests for *Brady* material. *See Collins v. Hynes,* Kings Co. Index No. 22973/96, Decision and Order, Jan. 22, 1997, p. 8 (Dowd, J.) (District Attorney's search for records requested under the FOIL "shall not be limited to respondent's case file in the underlying criminal case, but to any record" in the District Attorney's possession; the statute "does not limit searches to case files" but "to records kept by the agency."); and</li>
<li>Summarily deny defendants' post-conviction FOIL requests for *Brady* material whenever the KCDA did not find documents specifically labeled "*Brady* material" in defendants' files, despite the fact that the *content* of the records was *Brady* material, and *Brady* material was held outside of defendants' trial files. *See* Deposition of Morgan J. Dennehy, above, at pp. 59, 93-94, 127-29 (admitting to this practice).</li>
</ol>

13. Finally, Cooper names the NYCTA as a defendant as its Police Department's

policies, customs, and practices substantially caused Cooper's injuries as well. Part of the reason

---

[3] *See* Senior Homicide Prosecutor Stan Irvin's CPL § 440.10 Hearing Testimony in *People v. Tasker Spruill*, Ind. No. 13008/95, July 27 and November 2, 2016 (admitting to this *Damiani* practice); KCDA's Appellant's Brief in Spruill, 24, 26-27 (KCDA admitting to the affirmation practice); Transcript of Oral Argument in *People v. Spruill*, Ind. No.13008/95, July 13, 2016, p. 27 (KCDA taking the position that in the 1990s it was permissible to use court orders to "browbeat" recalcitrant inmate witnesses into meeting with prosecutors, after it was revealed that a homicide prosecutor involuntarily produced a witness to the KCDA seven times, an inmate tried to kill himself to avoid one of those forced productions).

the three NYCTA detectives fabricated evidence against Cooper and suppressed *Brady* material was because the Transit Police Department was utterly indifferent to such misconduct, and failed to supervise and discipline officers who committed it.

14.     In the nine-years before Cooper's arrest, at least *four* government reports condemned the NYCTA Police Department, finding "serious irregularities and wrongful arrests on fabricated criminal charges" by Transit Police, that general and specialized legal training offered to Transit Police was "inadequate," and that Transit Police arrests were "vulnerable to legal attack and routinely trivialized by prosecutors and judges." *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 121 (2d Cir. 1991) (quoting one of those reports).   The reports further concluded that despite these systemic failures, there was "no clear line of authority with respect to discipline."

15.     During that same time period, scores of complaints were lodged regarding Transit Police officers' false arrest and malicious prosecution of civilians.  Yet despite the obvious need to investigate, supervise, and discipline such officers, the Transit Police took no remedial action.

16.     Instead, culpable officers received promotions, pay raises, and stayed on the force even after their misconduct was exposed, prosecutors complained about them, and the Transit Police's own Internal Affairs Division found they "made scores of false or improper arrests." *See* Richard Levine and Elizabeth Neuffer, *Four New York Officers Accused of Unlawful Arrests*, New York Times, November 24, 1987.

17.     In sum, what the defendants in this case did to Cooper is egregious.

18.     Cooper lost the best years of his life in prison for a crime he did not commit.  He was repeatedly assaulted and suffered extraordinary mental and emotional damages that continue to this day.  The defendants' conduct entitles Cooper to substantial compensatory and punitive damages.

## JURISDICTION, VENUE & CONDITIONS PRECEDENT

19.     This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

20.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

22.     On or about November 18, 2020, Cooper filed with Defendant City of New York a timely Notice of Claim under General Municipal Law § 50-e.  Cooper's General Municipal Law § 50-h hearing was held on February 24, 2021.

23.     More than 90 days have elapsed since Cooper's submission of his notice of claim and 50-h hearing.  Cooper has complied with all conditions precedent to commencement of this action.

## THE PARTIES

24.     Plaintiff EMMANUEL COOPER ("COOPER") is a citizen and resident of the State of North Carolina and of the United States.

25.     Defendant, CITY OF NEW YORK ("CITY"), of which the County of Kings is a subdivision, is a municipal corporation of the State of New York and governs in the Eastern District of New York.

26.     Defendant, NEW YORK CITY TRANSIT AUTHORITY ("NYCTA"), is a public authority organized under the laws of the State of New York, and operates in the Eastern District of New York.  At all times relevant to this Complaint, the NYCTA maintained and operated its own police department, the NYCTA Police Department ("NYCTAPD").

27.     Defendant, JAMES E. YOUNG ("YOUNG), at all relevant times, was a detective employed by the NYCTA and NYCTAPD, and acted toward Cooper under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

28.     Defendant, Detective CARTER ("CARTER"), first name currently unknown, at all relevant times was a detective employed by the NYCTA and NYCTAPD, and acted toward Cooper under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

29.     Defendant, Detective JEREMIAH LYONS ("LYONS"), at all relevant times, was a detective employed by the NYCTA and NYCTAPD, and acted toward Cooper under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

30.     Defendant, Detective JACK CUTRONE, at all relevant times was a detective employed by the New York City Police Department ("NYPD"), acted toward Cooper under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

31.     Defendant, Detective HUGH AGAR, at all relevant times was a detective employed by the New York City Police Department ("NYPD"), acted toward Cooper under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

32.     Defendant, Detective TARTAGLIA, first name currently unknown, at all relevant times was a detective employed by the New York City Police Department ("NYPD"), acted toward Cooper under color of the statutes, ordinances, customs, and usage of the State of New

York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**A.     The Crime**

33.     On November 25, 1992, at approximately 10:30 pm, NYCTA Token Clerks Andres Barretto and Elaine Terry were working inside the token booth at the Euclid Avenue subway station in East New York, Brooklyn.

34.     Terry noticed Russell Bratton, a token clerk who had worked in the Euclid Avenue subway station token booth the night before, lingering around a nearby telephone booth in the station.

35.     Two other men, who would rob the token booth minutes later, simultaneously lingered in the subway station as well.

36.     After several minutes, Bratton walked to the token booth and asked Barretto if he could come inside to retrieve papers he claimed he left there the night before.

37.     Barretto, trusting Bratton, opened the token booth door to let Bratton inside the token booth.

38.     As Barretto opened the door to let Bratton in, the two men who had been lingering in the station at the same time as Bratton rushed to the token booth behind Bratton.

39.     The taller of the two men pushed Bratton to the ground and tried to rush inside the token booth.

40.     Barretto struggled with the taller perpetrator at the door trying to prevent him from entering.

41.     The taller perpetrator then reached into his jacket, pulled out a gun, and shot Barretto once in the chest.

42.     The taller perpetrator then ordered Terry and Bratton out of the booth, and then rushed inside and began taking money from the cash draw.

43.     Both Terry and Bratton had split second, momentary glimpses of the shooter as they were ordered out of the token booth and ordered to lay face down on the floor.

44.     Other people who were inside the subway station, however, were able to get a good look at the perpetrators.

45.     One of those people was a man named Thomas Volino.  Volino was in the subway station when he heard a gunshot and saw the perpetrators rush to the token booth.

46.     As they did, Volino recognized the taller perpetrator, the shooter, as someone he knew from the neighborhood.

47.     Two other women in the subway station, Michelle Forde and Romella Rivera, witnessed the crime as well.

48.     Both Forde and Rivera saw the two perpetrators lingering in the subway station before the crime, and after hearing the gunshot, Forde and Rivera fled the station.

49.     In the process of fleeing, Forde dropped one of her earring in the subway station, which a police officer later recovered.

50.     After the taller perpetrator stole money out of the booth, both perpetrators fled upstairs to a waiting getaway car.

51.     As the two perpetrators ran out of the subway station and into the getaway car, a man named David Lucas, who was across the street from the subway entrance, saw the taller

perpetrator running with a .380 caliber gun in his hand, the very type of weapon the police would later determine was used in the crime.

52.    Lucas immediately recognized the taller perpetrator as a local drug dealer named "Chris" who he knew from the neighborhood.

53.    The two perpetrators got into the getaway car and fled the crime scene.

54.    Police officers from the NYPD and NYCTAPD arrived at the subway station minutes after the perpetrators escaped.

55.    The NYCTAPD immediately deemed the case a high profile one and assigned it to its Major Case Squad.  Detectives James Young ("YOUNG") and Carter ("CARTER") were assigned to lead the investigation.  Working alongside of YOUNG and CARTER was NYPD Detective Cutrone ("CUTRONE") from the 75th Precinct, which covered the area where the Euclid Avenue subway station was located.

56.    Police interviewed Terry who, told them the taller perpetrator was the shooter, and described him as a black male, between 5'9 to 5'10, 160lbs.

57.    Police interviewed Bratton as well, but he told them he was not able to identify the perpetrators because they had both worn hoodies, and he had only a split second glance at them.

58.    Police interviewed Volino who described the shooter as 5'10, 160 lbs., clean-shaven, with a scar or design on the right side of his head.

59.    Police interviewed Lucas as well, who described the shooter as a man he knew from the neighbored as Chris, 5'10 to 5'11, 175-190 lbs.   Lucas also told police that Chris was known to use a .380, the same caliber of gun Lucas saw Chris carrying as he fled the subway station.

60.     Both Volino and Lucas told police they could positively identify the shooter as they both knew him from the neighborhood.

61.     Lucas actually informed police that Chris would normally hang out on Crystal Street between Liberty Avenue and Glenmore Street, not far from the subway station. (Volino's and Lucas' identification of someone other than Cooper was suppressed from Cooper and his attorneys for 27 years.)

62.     Cooper did not match the physical description of the shooter given by the eyewitnesses to the crime.   Cooper was only 5'7 and 145 lbs.

63.     Cooper's photograph was displayed to Terry, Bratton, Lucas, and Volino *and all four of them failed to identify Cooper as the perpetrator.*

64.     Terry later gave an NYPD sketch artist a description of the perpetrator that looked nothing like Cooper:

**Emmanuel Cooper's Photograph Which Terry, Bratton, Lucas, and Volino Failed To Identify**

**Police Artist Sketch Of The Shooter Based On Terry's Description**




65.     Additionally, shortly after the crime, the NYPD received numerous leads in the case, some of which identified someone other than Cooper as the perpetrator and others that provided substantial grounds for further investigation, including:

(a)     A call from an informant telling police that he knew the two men who committed the murder, and that they lived at addresses other than where Cooper lived at the time;

(b)     An anonymous call informing police that the shooter lived at 48 Hull Street in Brooklyn (an address other than where Cooper lived);

(c)     A call from a man who told police that a man named Alex confessed to him that Alex had been the driver of the getaway car, and provided police with the actual license plate number to the getaway car; and

(d)     A call from Hildago Carter informing police that he had witnessed two male blacks rob another token booth a little over a month ago, and that he believed they may have been responsible for the Euclid Avenue robbery and murder.

66.     Police also developed two suspects in the murder: a man James Cunnings and another man named Luther Smalls.

**B.     Detectives Manufacture Evidence To Arrest Cooper For The Murder**

67.     Despite the above evidence, Detectives AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE, under enormous pressure to make an arrest in the high-profile murder,[4] elected to manufacture evidence to arrest Cooper —a young man who lived in a nearby housing project— to "solve" the crime.

---

[4]The murder of the New York City token clerk attracted considerable media attention. *See e.g.* Mary B. W. Tabor, Clerk in a Token Booth Is Fatally Shot in Robbery, New York Times, November 27, 1992.

### 1. Detectives Coerce Crack Addict Rico Sanchez
### Into Falsely Identifying Cooper

68. On December 4, 1992, at approximately 12:30 am, a little over a week after the murder, a career criminal, crack addict, and parolee named Rico Sanchez attempted to murder two people in East New York, Brooklyn.

69. Sanchez was driving a Suzuki jeep at the time, high on crack-cocaine and armed with a shotgun.

70. He followed his two victims, who were driving in another car. When Sanchez's jeep was alongside of their car, Sanchez fired his shotgun into the driver's side window of his victims' car at point blank range.

71. Sanchez missed and the two victims, Javier Santiago and Cynthia Muniz, managed to speed off without being injured.

72. Sanchez drove away, and the victims' car then circled back and attempted to follow him.

73. As Sanchez fled, two uniformed officers in their police vehicle saw Sanchez's jeep driving erratically.

74. The police officers were from the 75th Precinct in Brooklyn, the same precinct that along with the NYCTAPD was investigating the token clerk's death.

75. The police pursued and eventually managed to stop Sanchez's jeep. As the officers questioned Sanchez, Santiago and Muniz's car pulled up beside them and told police Sanchez had just tried to kill them.

76. The police placed Sanchez under arrest and traced the route he had driven.

77.     The officers discovered a parked car with a broken window.  Inside the car in the back of the car was the shotgun Sanchez had just used in the attempted murder. The shotgun was still warm and had smoke coming out of the barrel.

78.     The police charged Sanchez with two counts of attempted murder.  Sanchez's Suzuki Jeep, which was used in the commission of the crime, was seized as evidence.

79.     The case against Sanchez was powerful: both of his victims positively identified him and gave prosecutors audio recorded sworn statements identifying Sanchez.   Further, Sanchez was arrested fleeing from the scene, and the shotgun he used in the crime was recovered.

80.     At the time of Sanchez's arrest, he was on parole for a prior felony burglary conviction, and as a second violent felony offender in possession of the shotgun and charged with two counts of attempted murder, he faced up to 25 years incarceration in a maximum security prison.

81.     When Sanchez arrived at the 75th Precinct, AGAR and TARTAGLIA questioned him about whether he knew Cooper, whom detectives had learned was rumored to have been involved in the crime.

82.     When Sanchez acknowledged that he knew Cooper from the neighborhood, the detectives set about manufacturing a false narrative about Cooper being involved in the token clerk's murder and pressured, bribed, and coerced Sanchez into adopting that false story by threatening Sanchez with prosecution for possession of the shotgun and two counts of attempted murder.

83.     At the time, there was no probable cause to arrest Cooper or any reasonable cause to believe he was guilty of the crime.

84. AGAR and TARTAGLIA showed Sanchez the shotgun recovered during his arrest and told Sanchez he would be prosecuted for serious felony charges.

85. Sanchez denied any knowledge of the crime, much less that Cooper was involved in it, but AGAR and TARTAGLIA showed Sanchez Cooper's photograph and pointed to Cooper as the man who committed the murder.

86. AGAR and TARTAGLIA told Sanchez that if he did not cooperate with them, he would be sent away to prison for the rest of his life.

87. Sanchez's interrogation continued for several hours.

88. As Sanchez continued to refuse to cooperate, his Suzuki Jeep, which was in police custody, was suspiciously destroyed by fire.

89. Sanchez's jeep had been impounded in the 75th Precinct's parking lot at the rear of the building as evidence used in the attempted murder.

90. The parking lot was highly secured, part of a police precinct staffed with multiple detectives and officers, and regularly monitored.

91. Despite this security, Sanchez's Jeep was somehow burned to the point that it was totaled.

92. YOUNG, CARTER, and CUTRONE arrived at the precinct and interrogated Sanchez as well. They promised Sanchez, along with AGAR and TARTAGLIA, that if he said what they wanted him to say, they would make his attempted murder charges "go away."

93. Sanchez capitulated. and agreed to falsely implicate Cooper in the murder.

94. Sanchez adopted the narrative AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE fed to him about seeing COOPER fleeing the subway station while holding a gun, and "identified" Cooper's photograph as that of the perpetrator.

95.    AGAR then memorialized "Sanchez's'" statement and identification in a
December 4, 1992, NYPD report.  In that report, AGAR additionally claimed that Sanchez had
unilaterally "offered" police information concerning the homicide.

96.    The report, while recounting Sanchez's false statement and identification,
omitted:

    (a)    Sanchez was brought to the precinct under arrest for attempting to
murder two people,

    (b)    Sanchez was high on crack at the time he was interrogated, which
was obvious to AGAR, TARTAGLIA, YOUNG, CARTER, and
CUTRONE,

    (c)    Sanchez made several false statements to police denying his involvement
in the attempted murders,

    (d)    Sanchez initially denied any knowledge of COOPER being involved in the
murder,

    (e)    The highly suspicious circumstances surrounding the destruction of
Sanchez's jeep by fire while in police custody, suggesting the fire was
a means to coerce Sanchez into cooperating against Cooper,

    (f)    Sanchez's statement incriminating Cooper was false, and had been fed to
him by AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE,

    (g)    Sanchez's identification of Cooper was false, and

    (h)    The other improper and coercive tactics AGAR, TARTAGLIA, YOUNG,
CUTRONE, and CARTER used to secure Sanchez's cooperation,
including their promise to make his attempted murder charges go away if
he implicated Cooper.

97.    YOUNG memorialized "Sanchez's" statement and identification in a December 4,
1992, police report as well, this one prepared for the NYCTAP.

98.    YOUNG's report:

    (a)    Omitted all of the above information (¶ 96),

(b)     Omitted that Sanchez was even under arrest at the time he "identified" Cooper, and

(c)     Represented Sanchez identified Cooper from a photo array.

99.     After coercing Sanchez into adopting their manufactured statements, AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE, carried through on their promise to make Sanchez's charges go away.

100.    Although Sanchez was arrested on two counts of attempted murder and weapon possession, Sanchez was charged with reckless endangerment, two class D felonies. All charges against Sanchez were then dismissed within three weeks of his agreement with the detectives to implicate Cooper.

### 2.     Detectives Manufacture Thomas Volino's False Identification Of Cooper, And Use It As A Basis To Have Cooper Placed In A Lineup

101.    On December 15, 1992, Detective Jeremiah Lyons ("LYONS"), acting in concert with fellow detectives AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE, met with Thomas Volino, one of the two men who knew the perpetrator from the neighborhood (¶¶ 45-46, 58, above).

102.    LYONS showed Volino a photo array containing Cooper's photograph.

103.    Volino, who knew the perpetrator and was looking for his picture in the photo array, did not identify Cooper. Instead, Volino informed LYONS he did not see the perpetrator in photo array.

104.    Nevertheless, despite that negative identification, LYONS prepared a false police report dated December 15, 1992, representing Volino positively identified Cooper's photograph as that of the perpetrator.

105.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS then reported to the KCDA that Volino positively identified Cooper, and forwarded LYONS' false police report to the KCDA.

106.     The KCDA then used Volino's "identification" of Cooper to obtain a court order to have Cooper placed in a lineup in connection with the token clerk's murder.

107.     The lineup took place on January 11, 1993.

### 3.     Detectives Threaten Russell Bratton That He Would Be Charged With The Murder If He Did Not Cooperate, And Used Inherently Improper Tactics To Coerce Him Into Identifying Cooper

108.     Unbeknownst to the defense, YOUNG, CARTER, and CUTRONE deemed Bratton a suspect in the murder because he had convinced the decedent token clerk to open the locked door to the token booth.

109.     On several occasions, YOUNG, CARTER, and CUTRONE brought Bratton to the police precinct and accused him of being in on the crime.  They terrified Bratton by threatening to charge him with the murder and send him to prison if he did not cooperate with them.

110.     Bratton told YOUNG, CARTER, and CUTRONE that he could not identify the perpetrators, but the detectives said he was lying and warned him not to say that again.

111.     In response to this pressure, Bratton was distraught, felt trapped, and felt that if he did not assist YOUNG, CARTER, and CUTRONE, he would be charged with the murder.

112.     On January 11, 1993, YOUNG and either CARTER or CUTRONE picked Bratton up to bring him to the precinct to view Cooper in the lineup.

113.     The detectives told Bratton they had the shooter, lied to him that Terry had already identified Cooper, and said they needed Bratton to identify him as well.

114. The detectives reminded Bratton, in sum and substance, that he was still a suspect in the murder and could be charged with it as well.

115. Bratton, scared that he would be arrested if he did not make an identification, and desiring to placate the detectives, and then viewed the lineup.

116. Bratton took *nearly five minutes* to make an "identification." Even then Bratton only identified Cooper as someone who stood out. This identification was made because Bratton had seen Cooper in the train station on an earlier occasion and had previously seen Cooper's picture in the photo array from which Bratton failed to make an identification.

117. Terry viewed the lineup as well. She too looked at the lineup *for five minutes* and said it was between a filler and Cooper, but that Cooper's complexion most closely resembled that of the perpetrator.

118. Volino viewed the lineup and looking for and not finding the shooter he knew from the neighborhood, he failed to identify Cooper.

119. After the lineup, detectives told Bratton and Terry they both made a correct identification.

120. Bratton and Terry were also provided with Cooper's full name, which was previously unknown to them.

121. YOUNG, CARTER, and CUTRONE, knew that Bratton's identification was false and had been coerced, and that it would be introduced in court in Cooper's case.

122. Nevertheless, YOUNG, CARTER, and CUTRONE induced and coerced Bratton to testify to that false identification.

## C.    Cooper Is Arrested And Indicted

123.    After the lineup, YOUNG, CARTER, CUTRONE, and LYONS sought approval from the KCDA to arrest Cooper for the murder and robbery.

124.    YOUNG provided the KCDA with his own and AGAR's false December 4, 1992, police reports, memorializing Sanchez's manufactured statements, and represented to KCDA prosecutors tasked with deciding whether to authorize Cooper's arrest and prosecution that Bratton and Terry had positively identified Cooper in the lineup.

125.    While urging KCDA prosecutors to charge Cooper based on evidence developed during the police investigation, AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS failed to reveal to the KCDA numerous items of exculpatory and/or impeaching information, including:

(a)    Their own and each other's misconduct,

(b)    Sanchez was high on crack-cocaine when he was interrogated, which was obvious to YOUNG, CARTER, and CUTRONE,

(c)    Sanchez initially denied any knowledge about COOPER being involved in the crime,

(d)    YOUNG, CARTER, and CUTRONE fed Sanchez the false story incriminating COOPER, and forced him to identify COOPER as the perpetrator,

(e)    YOUNG, CARTER, and CUTRONE used improper, unlawful, and coercive tactics to secure Sanchez's cooperation,

(f)    The suspicious circumstances surrounding the destruction of Sanchez's Suzuki jeep, and the likely impact that had on Sanchez's interrogation, and the likely intimidating impact that had on Sanchez during his interrogation,

(g)    AGAR and YOUNG's December 4, 1992, reports memorializing Sanchez's statement were false or misleading,

(h)    LYONS fabricated Volino's identification of Cooper,

(i)     LYONS' December 15, 1992, police report memorializing Volino's "identification" was false,

(j)     YOUNG, CARTER, and CUTRONE's threats to Bratton to have him charged with the murder if he did not cooperate,

(k)     YOUNG, CARTER, and CUTRONE directed Bratton not to repeat his statement that he could not identify the perpetrator,

(l)     YOUNG, CARTER, and CUTRONE told Bratton they had the shooter, Terry had already identified him, and they needed Bratton to identify him as well,

(m)     Following the lineup, YOUNG, CARTER, and CUTRONE informed Bratton and Terry that they made the correct identification, and

(n)     The evidence identifying someone other than Cooper as the perpetrator. (¶¶ 65-66)

126.    Based on AGAR, TARTAGLIA, YOUNG, CARTER, LYONS, CUTRONE's "evidence" and presentation, the KCDA approved Cooper's arrest and prosecution.

127.    YOUNG then executed a felony complaint against Cooper falsely alleging Bratton had informed YOUNG that Cooper was the shooter when, in truth, Bratton merely stated Cooper stood out.

128.    In January 1993, the KCDA, presented Cooper's case to a grand jury through a false, misleading, and incomplete grand jury presentation.

129.    Two witnesses offered affirmative evidence against Cooper in the grand jury: Terry and Bratton.

130.    The prosecutor presenting Cooper's case did not inform the grand jury of:

(a)     The information AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS concealed from the KCDA in convincing them to authorize Cooper's arrest and prosecution (¶ 125, above),

(b)     David Lucas' failure to identify Cooper from the photo array, his identification of "Chris," who he knew from the neighborhood, as the man

he saw fleeing from the crime scene carrying the murder weapon, and the police report and KCDA records documenting those facts,

(c)     Thomas Volino's failure to identify Cooper from the photo array and his identification of a local man he knew from the neighborhood as the perpetrator, and the police report and KCDA records documenting those facts,

(d)     Terry's failure to identify Cooper from the photo array,

(e)     Bratton's failure to identify Cooper from the photo array,

(f)     The police sketch based on Terry's description that did not resemble Cooper,

(g)     Terry's initial statement identifying the taller perpetrator as the shooter (¶ 56, above), which squarely contradicted her grand jury testimony that the shorter man, who she now claimed was Cooper, was the shooter,

(h)     Bratton was a suspect in the murder, and

(i)     That the nine fingerprints recovered from the crime scene did not match those of Cooper.

131.    On January 26, 1993, the grand jury, unaware of the above exculpatory evidence, returned an indictment charging Cooper with the murder and robbery.

132.    Cooper was remanded to Rikers Island and held without bail.

**D.    The District Attorney's Misconduct Prior To Trial**

133.    On February 16, 1993, KCDA Homicide Bureau Chief Michael F. Vecchione assigned Cooper's case to Assistant District Attorney ("ADA") MARK HALE.

134.    At the time, HALE was a Deputy Bureau Chief of the KCDA Homicide Bureau, one of only three high-ranking Deputy Bureau Chiefs who reported directly to Vecchione.

135.    As a Deputy Bureau Chief, HALE had virtually unlimited access to the records and files of the Homicide and Trial Cadre Bureaus, which handled violent crimes such as the attempted murder for which Sanchez had been arrested.

136.    Shortly after Cooper's arrest, Cooper's defense attorney submitted a motion to the court seeking a court order directing HALE to disclose all exculpatory and impeaching evidence held by the KCDA concerning Cooper's case, as well as any evidence, referred to as *Brady/Giglio* material, showing any witness against Cooper received a benefit in exchange for cooperating against him.

137.    Such material is required to be disclosed by prosecutors to defendants under the United States and New York State Constitutions to ensure defendants receive a fair trial.

138.    The *Brady* and *Giglio* rules are intended to enable defendants to impeach a witness, and show that the witness has some motive, bias, or interest in testifying against the defendant, and to challenge the integrity of the government's investigation.

139.    On May 6, 1993, in response to Cooper's motion for disclosure of that evidence, HALE submitted an affirmation to the trial court and Cooper's attorney swearing that there was no *Brady* known to the KCDA, and that "[n]o consideration [was] given to any witnesses."

140.    HALE's representations were false.  HALE failed to disclose to the defense the exculpatory and impeaching information concerning (a) David Lucas identifying "Chris" as the perpetrator, (b) Thomas Volino identifying the local man as the perpetrator, (c) Terry's initial statement identifying the taller perpetrator, (d) Lucas, Volino, Terry and Bratton's failure to identify Cooper from the photo array, and (e) that when Sanchez entered the precinct, he was handcuffed and charged with two counts of attempted murder, and that shortly after Sanchez implicated Cooper, the criminal charges against Sanchez were dismissed and sealed, and (f) the other information detailed in ¶¶ 65-66, 125, 130, above.

**E.** **The District Attorney's Misconduct During Cooper's Trial**

**1.** **The *Wade* Hearing**

141.     Cooper's trial took place from October through November 1993.

142.     By that time, Sanchez was serving a four-year sentence in state prison on an unrelated drug case he was convicted of in February 1993, after the dismissal of his attempted murder charges.

143.     HALE had KCDA Supervising Homicide Bureau paralegal, Liza Noonan Fitzpatrick, sign his name to an affirmation Noonan prepared in support of a "*Damiani*" or "take-out" order, allowing KCDA detective-investigators to bring Sanchez from state prison to the KCDA.[5]

144.     The affirmation falsely represented Sanchez had asked to meet with the KCDA, that an "Assistant District Attorney in Kings County," had affirmed it, and that Sanchez "communicated to [KCDA] representatives" that he possessed information regarding a criminal matter which he wanted to share with the office.

145.     The affirmation also falsely represented that Sanchez would be produced to the KCDA only if he provided his written consent to that production.

146.     In fact, Sanchez had not asked to meet with HALE or anyone from the KCDA, and Sanchez was unaware that HALE was making that sworn representation to the court.

---

[5]HALE having his paralegal sign his name to his affirmation comports with the practice of the KCDA Homicide Bureau in the early 1990s under which paralegals would sign ADAs' names to affirmations and fraudulently notarize affidavits that were used to obtain court orders. *See* Deposition of Supervising Homicide Paralegal Liza Noonan Fitzpatrick in *Collins v. City of New York*, 11 CV 766 (FB) (RML), May 10, 2013, pp. 7-10, 38-41, 52-55) (testifying that from 1985 to 1999 she worked under then Homicide Bureau Chief Michael F. Vecchione and others and, in accordance with "common practice," signed Vecchione's signature to numerous sworn notarized affidavits and affirmations in support of material witness and *Damiani* orders).

147.    Moreover, HALE had not signed the affirmation as he represented to the Court, but rather his paralegal had signed his name to it, rendering it a legal nullity under state and federal law.

148.    The court, based on that false affirmation, issued a *Damiani* order permitting KCDA detective-investigators to bring Sanchez from state prison to the KCDA.

149.    The order was explicitly contingent on Sanchez providing detectives-investigators with his written consent to being transferred.

150.    Without Sanchez's written consent, the KCDA had no legal authority to transfer a convicted inmate out of state prison to their office.

151.    On or about October 7, 1993, KCDA detective-investigators Stephen Bondor and Joseph Macias, attempted to execute the *Damiani* order at Great Meadow Correctional Facility, the state prison where Sanchez was incarcerated.

152.    Sanchez refused to accompany the detective-investigators to the KCDA.

153.    Sanchez recanted his prior statement and identification implicating Cooper (¶¶ 67-100), telling the detective-investigators that AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE had coerced him into adopting the statement.

154.    In response, Bondor and Macias threatened Sanchez that if he did not cooperate he would be held in contempt of court, his attempted murder case and illegal shotgun possession would be reopened, and he would be charged and sentenced for that crime.

155.    Bondor and Macias then coerced Sanchez to accompany them to the KCDA. Contrary to the explicit terms of the *Damiani* order upon which Sanchez's transfer was conditioned, Bondor and Macias never obtained SANCHEZ's written consent to be transferred, and the transfer was executed in clear violation of the order.

156.     Bondor and Macias communicated Sanchez's recalcitrance to HALE.

157.     After Sanchez's transfer to the KCDA, Sanchez was coached by currently unknown people in that office on how to testify. Sanchez was told the questions he would be asked and how he should answer them.

158.     On October 8, 1993, a pretrial *Wade* Hearing was held to determine whether Sanchez should be allowed to make an in-court identification of Cooper at trial.

159.     Sanchez falsely testified that he had seen Cooper running from the scene after two gunshots were heard, and about how his December 4, 1992, statement and identification of Cooper memorialized by YOUNG came about, casting them as originating from a voluntary interview by detectives.

160.     Sanchez falsely testified that he was *not* under arrest when he implicated Cooper, and that detectives had wanted to question him about the murder and he *voluntarily* accompanied them to the precinct.

161.     HALE then called YOUNG as a witness at Cooper's pretrial *Wade* hearing to bolster Sanchez's false account.

162.     YOUNG recounted under oath the false statements he, CARTER, CUTRONE, AGAR, and TARTAGLIA manufactured and coerced Sanchez into adopting (¶¶ 67-100), and lied about the manner in which Sanchez's statements and identifications of Cooper had come about.

163.     YOUNG also testified that it was *Sanchez* who made the December 4, 1992, statement, when in truth AGAR, TARTAGLIA,YOUNG, CARTER, and CUTRONE manufactured it and fed it to Sanchez. *Id.*

164.     YOUNG testified that before he showed Sanchez the photo array, he simply asked Sanchez to tell YOUNG if he recognized anyone, when, in truth, YOUNG pointed out Cooper's photo and forced Sanchez to identify him.  *Id.*

165.     YOUNG also testified that Sanchez "positively" identified Cooper when he viewed the photo array when, in truth, Sanchez repeatedly told AGAR and TARTAGLIA he had no knowledge of Cooper being involved in the crime, and Sanchez had been coerced into "identifying" Cooper.

## 2.     Rico Sanchez's Trial Testimony

166.     Sanchez testified at Cooper's trial a few days after the *Wade* hearing.  Sanchez repeated the false narrative that was fed to him by Young, Carter and Cutrone and memorialized in YOUNG's December 4, 1992, police report, and identified Cooper in court as the man he supposedly saw fleeing from the subway station holding a gun.

167.     Sanchez testified that in exchange for his testimony, the prosecution only promised to write a letter to the Parole Board regarding his 1993 drug case and help him get transferred to another prison.

168.     When Cooper's attorney asked Sanchez if there was anything the KCDA had promised him besides the letter, Sanchez answered, "No."

169.     Sanchez testified that he had two prior felony convictions, one for burglary, the other for sale of a controlled substance, and that he had also been fined for selling marijuana.

170.     Sanchez's omitted, however, that he had committed and been arrested for four additional crimes, the underlying facts of which HALE was required to disclose to the defense under state and federal law, including:

(a) An April 2, 1985, arrest for burglary stemming from police finding Sanchez in a ransacked apartment in possession of burglar tools and stolen property,

(b) A November 10, 1988, arrest for armed robbery stemming from Sanchez robbing his victim at gunpoint,

(c) The December 4, 1992, arrest for attempted murder and weapon possession leading up to Sanchez falsely implicating Cooper (¶¶ 67-100, above), and

(d) A January 2, 1993, arrest for criminal possession of stolen property, stemming from Sanchez being arrested while driving a stolen car.

171. Sanchez also repeated his false narrative about how his cooperation with detectives came about. Sanchez testified that he was hanging out on Pitkin Avenue in Brooklyn when police came by and asked if he would accompany them to the precinct because they wanted to question him.

172. Sanchez swore he was not handcuffed during the ride to the precinct, or placed in a holding cell once he arrived there. Sanchez swore the police were the first ones to bring up the murder.

173. Sanchez swore the entire conversation at the precinct pertained to the token clerk's murder, that the detectives did not suggest any names or suspects to him, that he independently gave detectives Cooper's name, and that after speaking to the detectives, he went home.

174. In response to Cooper's attorney's question if Sanchez had spoken to "anybody, any police officers since then[,]" Sanchez answered "No."

175. When Cooper's attorney sought to question Sanchez about whether he was in some sort of legal jeopardy that led to his presence in the precinct when he identified Cooper,

HALE objected and asked the court to block Cooper's attorney from pursuing that line of questioning.

176.     HALE argued there was no basis for the questioning and gave the court a false explanation about why Sanchez was in the precinct when he made "his" statement:

> I can tell you exactly.  There was a police report which indicates there was a young man … who talked to the police who said that, I believe my sister's boyfriend was outside in front of the station and told my sister that he saw the guy running out of the subway, and that he knows who it is.   And that they then subsequently picked up Mr. Sanchez to inquire about his knowledge of what he saw out on the street coming out of the subway.
>
> *That's it, pure and simple.* There is nothing that indicates from the police reports that he was in any way a suspect in this case. It is a fairly easy story to follow (emphasis added).

177.     The court accepted HALE's representations and precluded the defense from questioning Sanchez about why he was in the precinct on December 4, 1992.

178.     HALE's summation regarding Sanchez contained additional false or highly misleading statements that were directly contradicted by evidence HALE concealed from the defense, including:

(a)     Sanchez initially implicated Cooper when he had no incentive to do so: "When did he [make his initial statement incriminating Cooper]?  Well, you know something?  He said that when he wasn't under arrest.  He said that when he had no pending cases…. In other words, he said it when he didn't need any kind of a deal."

(b)     Sanchez's had no reason for testifying against Cooper at trial: "[W]hat reason, what does he have [to testify] against Kelly Cooper? Why pick on [him]? And the answer is he doesn't have a reason, unless he saw what he says he saw and heard what he says he heard."

(c)     The only thing the KCDA did for Sanchez was write a letter to the parole board, which did not influence his testimony: "And what kind of a deal is he getting, ladies and gentlemen?  ….  A letter to Parole so that he might get out when has served the minimum time for the sentence he [h]as

already been given, when he has already served his debt to you, to society."

    (d)    Sanchez had been open and honest about his prior criminal history. Sanchez, HALE argued, admitted "Yeah, I broke into people's houses. Yeah, I sold drugs. Was he being candid with you about his background? Or was he trying to hide something from you?"

179.    HALE did not disclose to the defense (a) the falsity of Sanchez's *Wade* hearing and trial testimony, (b) the falsity of HALE's representations to the court and his summation, (c) the existence of and factual and predicate for Sanchez's attempted murder arrest, (d) the legal jeopardy Sanchez was in when he was arrested for the attempted murder charges, (e) that the same day Sanchez supposedly implicated Cooper, he gave a false statement to police lying that he had not attempted to murder his two victims, (f) AGAR, TARTAGLIA,YOUNG, CARTER, and CUTRONE manufactured Sanchez's statement and identification, (g) AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE coerced and bribed Sanchez into implicating Cooper, (h) AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE's memobook entries regarding the true circumstances of Sanchez's interrogation, (i) the falsity of the police reports AGAR and YOUNG prepared concerning their interview of Sanchez, (j) Sanchez's criminal charges were dismissed in exchange for his cooperation, (k) HALE used a false affirmation to have Sanchez produced to the KCDA, (l) Sanchez recanted prior to trial, (m) Bondor and Macias threatened Sanchez and transferred him to the KCDA without his consent and against his will, (n) HALE and the NYCTAPD and/or NYPD arranged for Sanchez to receive $10,000 in reward money for his cooperation against Cooper, (o) the other impeaching information pertaining to Sanchez in ¶¶ 67-100, above, and (p) the evidence police received that someone other than Cooper committed the crime (¶¶ 65-66)

### 3. Russell Bratton's Trial Testimony

180.    HALE led Bratton to testify that on the night of the crime, he was pushed from behind as he entered the token booth to retrieve papers he left there the night before.  Bratton claimed he saw one perpetrator struggling with the decedent and then heard someone from outside the token booth say, "move out the way," and then heard a gunshot.

181.    As Bratton was ordered out of the token booth, he caught a glimpse of the man holding the gun, who at trial he identified as Cooper.

182.    HALE portrayed Bratton to the jury as an innocent robbery victim who credibly identified Cooper in the lineup with absolutely no undisclosed reason for doing so.

183.    Yet HALE concealed from the jury and defense all of the information undermining Bratton's identification (¶¶ 108-122), including that Bratton was a suspect in the murder and detectives used that fact to coerce him into identifying Cooper.

184.    HALE's summation regarding Bratton contained numerous false or highly misleading statements that were directly contradicted by the evidence he suppressed, including

(a)    Bratton was brought to the precinct to view the lineup "with no expectations [that he was] going to see somebody" or "which of the two [perpetrators he was] going to see."

(b)    Bratton's identification was totally independent of Terry's identification: "[T]hey came down and independently they looked at this lineup …. They saw the person. They asked them to come up toward them, and they both decided number five because they told you number five was the shorter man that was outside. What are the chances? What are the chances that both of them would look at the lineup, and not only would they select the same individual."

(c)    Bratton had no reason to falsely identify Cooper and he was able, based on his observation during the crime, to make an identification: "He says he saw the man.  And you know how you know he saw the man?  Because he went on thereafter to look at photo arrays and look at lineups and give descriptions.  And would a person do that who did not see?"

### 4. Elaine Terry's Trial Testimony

185.    HALE presented Terry at trial as a disinterested witness with no incentive for cooperating with the KCDA.  Terry identified Cooper as the man she saw holding a gun as she exited the token booth.

186.    Not disclosed to the defense was that a few months before Cooper's trial began, Terry's nephew, Donald Terry, was being prosecuted by the KCDA, that Terry served a surety for her nephew, and that she thus had an incentive to cooperate with the KCDA.

### F.    Cooper's Alibi Defense

187.    Cooper presented a powerful alibi defense at trial.

188.    Michelle Forde and Romella Rivera, the two witnesses who had been in the subway station and saw both of the perpetrators, swore that Cooper was not in the subway station when the shooting took place and that he was not the shooter.

189.    Tisha Williams and Beverly Russell testified that at the time of the crime, Cooper was at a Housing Project several blocks away with them.

190.    Nevertheless, the false presentation to the jury that Terry, Bratton and Sanchez were disinterested witnesses caused the jury to convict Cooper on all charges.

191.    Cooper was sentenced to 25 years to life in prison.

### G.    The KCDA's 27-Year Cover-Up Of The Misconduct In Cooper's Case

#### 1.    Cooper's Appeals

192.    Following Cooper's conviction, he appealed to the Appellate Division, Second Department seeking a new trial.  The KCDA assigned Sholom J. Twersky and Melissa M. Beck, prosecutors from its Appeals Bureau, to oppose Cooper's appeal.

193.     Those prosecutors had an ongoing duty to disclose the *Brady* material that HALE suppressed from Cooper at trial.  *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) ("For evidence known to the state at the time of the trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings.  Put differently, the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues.")

194.     Yet during Cooper's appeal to the Appellate Division, the prosecutors continued to suppress all of the *Brady* material in Cooper's case, and made affirmative misrepresentations of fact to the court.

195.     The prosecutors represented in their submission to the court that Sanchez was credible, the only consideration he received was a letter to the parole board, and urged the court to uphold the *Wade* hearing court's factual and legal findings based on his testimony.

196.     The prosecutors also argued Bratton was a credible, disinterested witness, and that there was no evidence of suggestiveness impacting his identification of Cooper.

197.     On December 29, 1995, the Appellate Division rejected Cooper's appeal as "without merit."  *People v Cooper*, 222 A.D.2d 690 (2 Dept. 1995).

198.     Two years later, in 1997, Cooper brought a *pro se* habeas corpus petition in the United States District Court for the Eastern District of New York.

199.     In response to Cooper's petition, Twersky presented the same false arguments to the district court that he had made to the Appellate Division.

200.     On May 25, 2000, the district court denied Cooper's habeas petition.

### 2.    Cooper's Freedom Of Information Law Requests

201.    Cooper, through a series of requests to the KCDA under the New York Freedom of Information Law ("FOIL"), Public Officers Law §§ 84-90, attempted to uncover *Brady* material that had been suppressed during his trial, and which the KCDA had a continuing obligation to disclose.

### i.    The Law Regarding The FOIL

202.    The Freedom of Information Law ("FOIL") requires New York City and State agencies, including a District Attorney's Office, to permit the public to inspect and copy every record it holds, excepting only those records that fall within one or more narrowly defined exemptions to disclosure.

203.    The FOIL imposes identical duties on all CITY agencies to handle such requests and to disclose such records.

204.    The FOIL also requires all CITY agencies to designate Records Access and Appeals Officers. The Records Access Officer receives and responds to FOIL requests.  He or she may grant access to the records or, if the records are exempt from disclosure, withhold the records and explain the reasons for doing so in writing.

205.    The person making the request may then administratively appeal to the agency's Appeals Officer, who is required to overturn the denial and grant access if the records do not properly fall within the grounds for denying access.

206.    If the Appeals Officer upholds the Records Access Officer's denial of a FOIL request, the decision is final and the requester may then commence a civil lawsuit, under Article 78 of the New York Civil Practice Law and Rules, to challenge the agency's decision.  However, New York law requires courts hearing such lawsuits to defer to an agency if it claims that the

requested records could not be located. In other words, the entire system assumes and relies on the truthfulness and honesty of the Records Access and Appeals Officers.

207. Both the Records Access Officer and the Appeals Officer are prohibited by law from denying a request by falsely claiming that a requested record does not exist. It is a crime to intentionally prevent the public from inspecting records requested under the FOIL. *See* Penal Law§ 240.65.

## ii.     Cooper's FOIL Requests

208. Beginning just seven months after his conviction, Cooper made a series of FOIL requests to the KCDA for (a) all police records regarding his case, (b) all *Brady* material, and (c) all statements made by witnesses in his case.

209. Cooper's first request was made on June 15, 1994. The KCDA Records Access Officer disclosed various police reports but denied the remainder of Cooper's request, claiming the *Brady* material he requested was either not in the possession of the KCDA or did not exist.

210. Cooper's second FOIL request was made on January 19, 2003, but the KCDA Records Access Officer denied the request on the ground that Cooper's original FOIL request had been fully and fairly resolved, and his latter request was duplicative of his original one.

211. On November 16, 2017, Cooper's new attorney made a FOIL request to the KCDA on his behalf. Cooper's attorney asked that the KCDA disclose (i) any and all records relating to the murder case, (ii) all police reports, (iii) police vouchers, (iv) detective notes regarding Elaine Terry, (v) Sanchez's criminal records, and (vi) any promises or reward money paid to Sanchez.

212. On June 17, 2018, KCDA Records Access Officer Douglas O'Connell denied the request on the ground that those records could not be located "after a diligent search."

### iii.    The Documents Wrongfully Withheld

213.    Twenty-seven years after Cooper's conviction, and after the filing of his CPL 440

motion, the KCDA finally disclosed some of the very records it had previously claimed did not

exist, including:

(a)    The police report, KCDA audiotape, and KCDA transcript containing David Lucas' exculpatory statement that Chris was the shooter, and that he saw Chris fleeing with the murder weapon,

(b)    The police report, KCDA audiotape, and KCDA transcript containing Thomas Volino's exculpatory statement that he knew the shooter from the neighborhood, someone other than Cooper,

(c)    YOUNG's handwritten note memorializing Terry's initial statement contradicting her grand jury and trial testimony that Cooper was the shooter,

(d)    Sanchez's arrest report reflecting Sanchez's arrest for attempted murder,

(e)    The felony complaint charging Sanchez with reckless endangerment,

(f)    Police ballistic reports and invoices regarding the recovery of the shotgun Sanchez used in his crime,

(g)    Police reports, KCDA audiotapes, and KCDA transcripts recording the statements of Sanchez's two victims about how Sanchez tried to kill them,

(h)    KCDA Investigative and Early Case Assessment Bureau reports regarding Sanchez's attempted murder case,

(i)    Sanchez's false statement to police denying his complicity in the attempted murder,

(j)    HALE's false *Damiani* affirmation, and

(k)    The *Damiani* order reflecting that Sanchez failed to provide his written consent to be taken to the KCDA, as required by the order.

**H.** **Twenty-Seven Years After Cooper Is Convicted, A New Attorney On His Case Uncovers The KCDA's Fraud, And The KCDA Then Agrees To Have Cooper's Conviction Vacated**

214.    By July 2019, Cooper had lost over 26 years of his life in prison on his wrongful murder conviction.

215.    Cooper had been denied parole twice because he refused to "admit" to a crime he did not commit.

216.    On July 31, 2019, following an extensive investigation, Cooper's new attorney uncovered some of the police and prosecutorial misconduct concerning Sanchez and Bratton.

217.     Cooper's attorney then moved in the Kings County Supreme Court to vacate Cooper's conviction pursuant to CPL § 440.10.

218.    Included with Cooper's motion were affidavits from both Sanchez and Bratton detailing their coercion and revealing the undisclosed motives, biases, and interests they had to implicate Cooper in the murder.

219.    In his affidavit, Sanchez recanted his statement against Cooper, and revealed how he had been secretly arrested on the attempted murder charges.

220.    Sanchez revealed how detectives had coerced him into implicating Cooper.

221.    Sanchez revealed how the KCDA detective-investigators threatened to reopen his attempted murder case and have him held in contempt if he recanted.

222.    Sanchez also revealed how he was prepped on how to testify at Cooper's trial, and the $10,000 reward he received after testifying against Cooper.

223.    Cooper's motion also included several *Damiani* orders HALE used to produce Sanchez to the KCDA, and the false affirmations used to obtain them.

224.     Bratton's affidavit revealed how detectives deemed him a suspect in the crime, subjected him to extensive interrogations, and threatened to charge him with the murder unless he implicated Cooper.

225.     Bratton's affidavit also recounted the suggestive tactics the detectives used to get him to point Cooper out in the lineup and how Bratton believed that if he did not help the detectives he would be charged with the murder.

226.     Finally, Cooper's motion included an expert report and affidavit from a nationally renowned eyewitness identification expert —Professor Jennifer Dysart — who the KCDA itself had retained and relied on in another wrongful conviction case.

227.     After reviewing the identification evidence, Professor Dysart concluded both Bratton's and Terry's identifications were deeply flawed and unreliable.

228.     Six months after Cooper filed his CPL § 440.10 motion, the prosecutor assigned to respond to his motion *conceded* that Sanchez had in fact been under arrest for attempted murder when he initially implicated Cooper in the crime.

229.     The prosecutor responding to Cooper's motion also conceded that HALE's trial claims to the contrary were false.

230.     The prosecutor also provided Cooper's new attorney with the arrest reports and KCDA records pertaining to Sanchez's attempted murder case.

231.     On January 8, 2020, the KCDA, confronted with the overwhelming evidence of misconduct in Cooper's case,  joined in Cooper's motion to vacate his conviction and asked the court to release Cooper from prison immediately.

232. The KCDA, in its papers joining in Cooper's motion, admitted that throughout Cooper's trial HALE suppressed evidence that Sanchez had been under arrest at the time he implicated Cooper and "identified" him in the photo array.

233. The KCDA admitted HALE made false statements to the court and defense regarding the circumstances surrounding Sanchez's interrogation.

234. The KCDA also admitted that Sanchez testified falsely at Cooper's *Wade* hearing and trial, and that HALE's summation claim that Sanchez had not been under arrest when he initially implicated Cooper was false.

235. On January 8, 2020, the Honorable Ruth E. Shillingford, Acting Supreme Court Justice, granted Cooper's motion, vacated his conviction, and released him on his own recognizance.

**I.      After Cooper's Conviction Is Vacated, The KCDA Continues To Suppress *Brady* Material**

236. While the KCDA consented to vacatur of Cooper's conviction based on the *Brady* and false testimony issues concerning Sanchez, unbeknownst to the defense, at the same time the KCDA joined in Cooper's motion, it continued to withhold *other exculpatory evidence* in his case, including:

(a)      The David Lucas recorded statement that identified someone other than Cooper as the perpetrator, and the police report and KCDA records documenting Lucas' statement, his existence, identification, and observations,

(b)      Thomas Volino's recorded statement identifying someone other than Cooper as the  perpetrator, and the police report and KCDA records documenting that identification,

(c)      Terry's initial statement to police identifying someone other than Cooper as the perpetrator,

(d)      Sanchez's four criminal cases (¶ 170), and

(e) AGAR's false December 4, 1992, report regarding Sanchez's interrogation, statement, and identification (¶¶ 95-96).

237. In March 2020, the KCDA, <u>while continuing to suppress all of this evidence</u>, announced it would retry Cooper for the murder because it believed Terry and Bratton were still credible witnesses.

238. On April 20, 2020, after 27-years of suppression, the KCDA finally provided Cooper's new attorneys with the *Brady* material concerning Lucas, Volino, and Terry.

239. In June 2020, Bratton was interviewed by the new prosecutor assigned to retry Cooper's case, ADA Emily Dean.

240. During that interview, Bratton informed ADA Dean that he might have identified Cooper because he recognized him *as a subway rider* who frequented the subway station, not because he saw Cooper commit the crime.

241. On November 9, 2020, the KCDA finally moved to dismiss the indictment against Cooper.

242. The KCDA admitted that in light of Bratton's June 2020 statement and Sanchez's recantation, it "no longer possess[ed] the required evidence to prove Mr. Cooper's guilt beyond a reasonable doubt[.]"

243. That same day, November 9, 2020, Judge Shillingford granted the KCDA's motion.

244. In dismissing Cooper's indictment, Judge Shillingford noted that a witness had recanted his testimony, "which means that somebody committed perjury at trial."

**J.** **Cooper's Damages And Injuries**

245. Cooper's injuries and damages include, but are not limited to:

    (a)    His false and malicious arrest, prosecution and conviction for murder and robbery, and sentence to life in prison;

    (b)    The wrongful denial or delay of his challenges to his conviction filed in State and Federal Court;

    (c)    His 24-year loss of his liberty, and the additional time he spent in jeopardy of being subjected to a retrial;

    (d)    Physical injuries he suffered during assaults by other inmates, and the mental and emotional effects of such assaults;

    (e)    Past and future physical illnesses and injuries as a result of his wrongful conviction and experiences in prison;

    (f)    Past and future mental and emotional injuries and suffering;

    (g)    The loss of the services, society, companionship, and consortium of his children, grandchildren, wife and fiancée, mother, brothers and sister, and other family members and friends;

    (h)    Legal fees and expenses for which he is responsible exceeding $400,000 based upon more than one thousand hours of attorney time necessitated by exhaustive investigation and litigation required to uncover the KCDA's misconduct.

### FIRST CAUSE OF ACTION

(Wrongful Arrest And Detention Under The Fourth Amendment and *Manuel v. City of Joliet*, 137 S.Ct. 911 (2017); 42 U.S. C. § 1983; All Defendants)

246. Cooper realleges the allegations contained in ¶¶ 1-245 of this Complaint, and incorporates them here and in all following paragraphs.

247. AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS, individually, collectively, acting in concert, and aiding and abetting each other, intentionally, recklessly, and with deliberate indifference to Cooper's constitutional rights, without probable

cause, and in disregard of overwhelming evidence of Cooper's innocence, wrongfully arrested and detained him for the token clerk's murder and for the robbery of the subway station.

248.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS, in absence of probable cause for Cooper's continued seizure, continued the seizure by making false representations and submitting false reports to the KCDA which continued the charges against Cooper and his detention and/or seizure.

249.     The defendants intended to confine Cooper.  Cooper was conscious of the confinement, did not consent to it, and the confinement was not otherwise privileged. By virtue of the foregoing, AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS are liable for Cooper's wrongful arrest and detention, and the damages set forth in ¶ 245, above.

250.     The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer), direct participation in the civil conspiracy to continue and cover-up Cooper's wrongful arrest, malicious prosecution, and conviction.  *See* ¶¶ 292-406, *infra* (*Monell* claim against the CITY).

251.     The NYCTA is liable for these wrongs by virtue of the NYCTA Police Department Chief's deliberate indifference to, and failure to train, supervise, and discipline his employees regarding such practices despite the Chief's awareness of the likelihood that his failure to do so would result in the injuries pled herein.  *See* ¶¶ 425-445, *infra* (*Monell* claim against the NYCTA).

## SECOND CAUSE OF ACTION

(Malicious Prosecution and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983; All Defendants)

252.     Cooper realleges the allegations contained in ¶¶ 1-251 of this Complaint, and incorporates them here and in all following paragraphs.

253.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS, individually, collectively, acting in concert and aiding abetting one another, intentionally, knowingly and willfully manufactured, or caused the manufacturing of,  false statements and identifications by Sanchez, which they improperly compelled or induced Sanchez to adopt, accusing Cooper of the token clerk's murder.

254.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS knew that the statements and identifications would be relied on by the KCDA and the court as a basis to authorize Cooper's arrest, actually arrest him, and to formally initiate his prosecution, and that the statements and identifications would be introduced into evidence at Cooper's trial. Sanchez's statements and identifications were in fact introduced during Cooper's pretrial *Wade* hearing and trial.

255.     By virtue of the foregoing, AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS, with actual malice, initiated, continued, or caused the initiation and continuation of, criminal proceedings against Cooper that they knew, or should have known, there was no probable cause for, and for which in fact there was no probable cause, and thereby caused Cooper to be deprived of his liberty.  Those proceedings were ultimately terminated in Cooper's favor, in a manner affirmatively indicating his innocence.   *See* Exhibit A  (Certificate of Disposition in *People v. Emmanuel Cooper*, Kings Co, Ind. No. 427/93).

256.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS knew, but withheld from the KCDA, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeaching evidence that tended to negate Cooper's guilt and which they knew or should have known the law required them to timely disclose.  This evidence included, but was not limited to, the items detailed in ¶¶ 65-66, 92-98, and 108-125 above.

257.     The aforesaid conduct, which AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS committed individually, collectively, in concert with and in aid of each other, and/or in concert or conspiracy with other named and unnamed individuals, operated to deprive Cooper of his rights under the Constitution and the Laws of the United States:

    (a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

    (b)    Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

    (c)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

258.     The foregoing violations of Cooper's federal constitutional rights by AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS directly, substantially, proximately, and foreseeably caused the initiation and continuation of Cooper's criminal

prosecution, his loss of liberty, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

259.    The foregoing violations of Cooper's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS' employment and authority.

260.    AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS committed the foregoing violations of Cooper's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to his constitutional rights or to the effect of such misconduct on his constitutional rights.

261.    By reason of the foregoing, AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS are liable to Cooper for compensatory and punitive damages.

262.    The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation in the civil conspiracy to continue and cover-up Cooper's wrongful and malicious arrest, prosecution, and conviction. *See* ¶¶ 292-406, *infra* (*Monell* claims against the CITY).

263.    Likewise, the NYCTA is liable for these wrongs by virtue of the NYCTA Police Department Chief's deliberate indifference to, and failure to train, supervise, and discipline his employees regarding, such practices despite the Chief's awareness of the likelihood that his failure to do so would result the injuries pled herein. *See* ¶¶ 425-445, *infra* (*Monell* claim against the NYCTA).

## THIRD CAUSE OF ACTION

(Evidence Manufacturing; Denial of A Fair Trial Under The Fifth, Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983; All Defendants)

264. Cooper realleges the allegations contained in ¶¶ 1-263 of this Complaint, and incorporates them here and in all following paragraphs.

265. AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS, individually, collectively, and acting in concert and aiding and abetting the other, intentionally, recklessly, and with deliberate indifference to Cooper's constitutional rights manufactured false evidence against Cooper.

266. Specifically, on December 4, 1992, AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS manufactured Sanchez's false statements and identifications implicating Cooper in the murder, and created the false December 4, 1992, reports purporting to contain genuine statements freely given by Sanchez (¶ 68-98).

267. On December 15, 1993, LYONS, acting in concert with AGAR, TARTAGLIA, YOUNG, CARTER, and CUTRONE, manufactured a photographic identification of Cooper by Thomas Volino.

268. Volino, who knew the perpetrator and was looking for his picture in the photo array, did not identify Cooper, but instead informed LYONS that he did not see the perpetrator in the photo array. Yet LYONS prepared a false December 15, 1992, police report representing that Volino positively identified Cooper's photograph as that of the perpetrator.

269. AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS then reported that false identification to the KCDA, which relied on it and LYONS' report to, among other things, deem Cooper the perpetrator, move for a court order placing him in a lineup, and bring and maintain charges against him.

270. YOUNG, CARTER, and CUTRONE also manufactured Bratton's January 11, 1993, lineup "identification" of Cooper. Bratton failed to identify Cooper from a photo array just days after the crime, and repeatedly told YOUNG, CARTER, and CUTRONE he could not identify the perpetrators because he had only caught a glimpse of them.

271. Yet YOUNG, CARTER, and CUTRONE told Bratton not to say that again, and threatened him with murder charges if he did not cooperate with them.

272. The detectives told Bratton they had the shooter, lied that Terry had already identified him, and told Bratton they needed him to identify the shooter as well, all while knowing Bratton could not identify the perpetrator.

273. By virtue of the above, YOUNG, CARTER, and CUTRONE coerced Bratton into falsely "identifying" Cooper in the lineup, the only person who Bratton had previously viewed in the photo array, and who he may have seen simply passing through the subway station as a patron on a different occasion. The detectives then confirmed and reinforced Bratton's wrongful identification by telling Bratton he had made the correct identification.

274. AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS then forwarded the above information to the KCDA and made verbal representations to KCDA prosecutors affirming the truth and reliability of Sanchez's statement, the report memorializing it, and Sanchez's, Bratton's, and Volino's "identifications" of Cooper as the perpetrator.

275. The KCDA in turn relied on this "evidence" to commence formal criminal proceedings against Cooper, and later introduced that evidence against Cooper during his pretrial hearing and during his criminal trial.

276. The above manufactured evidence was likely to, and did, influence the jury's decision.

277.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS' actions deprived Cooper of his right to not be prosecuted on fabricated evidence, and to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and were the proximate cause of his injuries (¶ 245, above).

278.     By reason of the foregoing, AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS are liable to Cooper for compensatory and punitive damages.

279.     The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation in the civil conspiracy to continue and cover-up Cooper's wrongful arrest, malicious prosecution, and conviction. *See* ¶¶ 292-406, *infra* (*Monell* claims against the CITY).

280.     Likewise, the NYCTA is liable for these wrongs by virtue of the NYCTA Police Department Chief's deliberate indifference to, and failure to train, supervise, and discipline his employees regarding such conduct, despite the Chief's awareness of the likelihood that his failure to do so would result the injuries pled herein. *See* ¶¶ 425-445, *infra* (*Monell* claim against the NYCTA).

## FOURTH CAUSE OF ACTION
(Suppression of *Brady v. Maryland*, 373 U.S. 83 (1963) and Denial Of A Fair Trial Under The Fifth, Sixth, Fourteenth Amendments; All Defendants)

281.     Cooper realleges the allegations contained in ¶¶ 1-280 of this Complaint, and incorporates them here and in all following paragraphs.

282.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS, individually, collectively, acting in concert, aiding and abetting, and conspiring with each other,

intentionally, recklessly, and with deliberate indifference to Cooper's constitutional rights, suppressed from the KCDA and Cooper (a) the exculpatory and impeaching information detailed in ¶ 65-98, 101-125, above, (b) their creation of false police reports, (c) their false representations to the KCDA to convince that office to criminally charge Cooper, and (d) their own and each other's misconduct.

283.    As a result of those defendants' suppression, HALE was unable to disclose the exculpatory information detailed in the preceding paragraphs, and to correct the false testimony and argument that flowed from the suppression of that evidence.

284.    The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Cooper's trial would have been different.

285.    AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS's actions deprived Cooper of his right:

> (a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

> (b)    Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

> (c)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

286.　　The foregoing violations of Cooper's federal constitutional rights by AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Cooper's criminal prosecution, loss of liberty, detention without bail, wrongful conviction, subsequent imprisonment, and other injuries and damages.

287.　　The foregoing violations of Cooper's rights amount to constitutional torts and were affected by actions taken under color of State law, and within the scope of AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS' employment and authority.

288.　　AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS committed the foregoing violations of Cooper's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Cooper's constitutional rights or to the effect of such misconduct on those rights.

289.　　By reason of the foregoing, AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS are liable to Cooper for the damages detailed in ¶ 245, above.

290.　　The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation in the civil conspiracy, concerted action, and aiding and abetting AGAR, TARTAGLIA, YOUNG, CUTRONE, CARTER, and LYONS, following Cooper's conviction,  to conceal and continue the suppression of this *Brady* material.  *See* ¶¶ 292-406, *infra* (*Monell* claims against the CITY)

291.    The NYCTA is liable for these wrongs by virtue of the NYCTA Police

Department Chief's deliberate indifference to, and failure to train, supervise, and discipline his

employees regarding such conduct, despite the Chief's awareness of the likelihood that his

failure to do so would result in the injuries pled herein.  *See* ¶¶ 425-445, *infra* (*Monell* claim

against the NYCTA).

## FIFTH CAUSE OF ACTION

(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on the
KCDA's unconstitutional policies, customs, and practices,
and failure to supervise, discipline, and rectify amounting to
deliberate indifference)

292.    Cooper repeats the allegation in ¶¶ 1-291 above and incorporates them here and in

all following paragraphs.

293.    In 1989 New York City was plagued with an astonishing 1,905 murders, more

than any other year in city history.  The next year —1990, when Charles J. Hynes took office as

District Attorney for Kings County— the number was even worse.  The City, struggling to

contain an exploding crack-cocaine epidemic and the violence accompanying it, saw murders

skyrocket to 2,605.  Almost half of those murders occurred in Brooklyn.

294.    A September 7, 1990, front page article in the New York Post aimed at then NYC

Mayor David Dinkins captured the climate at the time: Crime Ravaged: "City Cries Out For

Help: 'Dave, Do Something!'"[6]

295.    In response, Hynes, the Kings County District Attorney from 1990 to 2013, who

campaigned on a "get tough on crime" platform, instituted a series of no holds barred, anything

goes, scorched earth, policies.  The policies were aimed at winning convictions at any cost,

---

[6]Ed Koch, Ray Kerrsion, Jerry Nachman, *Crime Ravaged City Cries Out For Help: 'Dave, Do
Something!*, New York Post, September 7, 1990, p. 1.

including by suppressing exculpatory evidence and using false testimony, coercing witnesses to provide testimony the office desired, irrespective of its truth or falsity, and disregarding any collateral damage inflicted in the process.

296.    Specifically, during the entirety of Hynes' time in office, including the time of the token clerk's November 25, 1992, murder investigation and Cooper's 1993 arrest, prosecution, and conviction, Hynes maintained affirmative or *de facto* office-wide unconstitutional or improper policies, customs, and practices that evinced deliberate indifference to the constitutional rights to due process and a fair trial, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, of defendants who were investigated, arrested, or prosecuted by that office, including,

   (a)    Refraining from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the KCDAs "riding" program, prosecutors were permitted and encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt, or the office's narrative of the case,

   (b)    The improper manipulation of witnesses, and creation of false or inherently unreliable testimony, through physical and psychological coercion, threats, unlawful detentions, and promises of rewards,

   (c)    The toleration of police and detectives who used such practices, especially those handling homicide and other high-profile cases,

   (d)    Withholding prosecution witnesses' pretrial recantations if the prosecutors disbelieved, or at least claimed to disbelieve, the recantations, a blatant violation of *Brady* which requires any *objectively* favorable information to be disclosed to the defense,

(e)     The maintenance of an illegal "office-subpoena" practice, repeatedly condemned by New York courts, whereby subpoenas were used to coerce witnesses into meeting with prosecutors at the KCDA, and if the witnesses refused to appear, they would be brought to the KCDA against their will,

(f)     The maintenance of an illegal material witness warrant practice, whereby material witness warrants were obtained with false affirmations and, instead of bringing witnesses to court "forthwith" as required under New York law, material witness warrants were used to force witnesses to meet with prosecutors at the KCDA, and circumvent the witness' statutory right to counsel. Moreover, both the detective-investigators and the prosecutors who obtained the material witness warrant would affirmatively lie to the witness that the only choice the witness had was to go to jail or "agree" to be held in the KCDA's custody, when as a matter of law, the witness was entitled to an evidentiary hearing, had the possibility of being ordered released, and the court was mandated to grant the witness a reasonable bail if detention was ordered,

(g)     The maintenance of an illegal "Hotel Custody Program," in which the KCDA, with no legal authority to do so, imprisoned recalcitrant witnesses to coerce them into testifying, deprived them of their statutory right to counsel, and held them *incommunicado* in hotel rooms as prisoners, with their hotel doors shackled, guarded by detective-investigators, and without the ability to use a telephone or have visitors without the prosecutor's permission,

(h)     The maintenance of an illegal "order to produce" practice, by which prosecutors would obtain court orders to unilaterally have inmates produced from jail or prison to the courthouse, purportedly to have them appear as witnesses when, in truth, the cases which the inmates were produced on were not being heard, the prosecutors' claims otherwise were false, and the attorney affirmations used to obtain the order to produce were counterfeit ones which had been actually signed by a paralegal,

(i)     The abuse of *Damiani* orders to coerce defenseless inmates into testifying against criminal defendants by (1) submitting false affirmations to the court purporting to have been affirmed to and signed by prosecutors but which were actually signed by a Homicide Bureau paralegal (2) falsely representing in those "affirmations" that the target inmates asked to speak with the KCDA when, in truth, they had not and the prosecutors were unilaterally producing the inmates to the KCDA, (3) falsely representing to the court that

the inmates would not be produced to the KCDA unless they consented, but then do nothing to honor that promise or ensure that the inmates consented to the production, and many times produce those inmates without their consent or against their will, and (4) not disclosing any of these circumstances to the defendants the inmates testified against,

(j)    The secret practice of causing Corrections and State Division of Parole officials to revoke the release of former inmates to compel them to appear at the KCDA and to compel them to "cooperate,"

(k)    The withholding from criminal defendants favorable evidence under *Brady* and its progeny, including the KCDA's abuse of process to secure testimonial evidence,

(l)    The knowing or reckless use of, reliance on, and failure to correct false, misleading, or inflammatory evidence and argument, and

(m)    The KCDA's post-conviction policy and custom of covering up *Brady/ Giglio* violations committed by trial prosecutors (¶¶ 425-445, below), by which the KCDA ensured defendants would never discover the *Brady* material suppressed from them at trial.

297.    The existence, in 1992-1993, of the policies, customs, and practices identified in above in ¶ 296 (a), (c), (d), (e), (f), (g), (h), (i), (j), and (m) is established by sworn *admissions* of former KCDA prosecutors, KCDA records, and/or admissions by Hynes himself during his 2013 videotaped deposition in the Jabbar Collins case.[7]

_____

[7]*See e.g.* Deposition of Charles J. Hynes in *Collins v. City of New York* 11 CV 766 (FB) (RML), December 13, 2013 (admitting to Hotel Custody Program and practice of not taking notes); Deposition of Theresa Corrigan in *Zahery v. City of New York,* 98 CV 4546 (LTS) (admitting to pretrial witness recantation practice); Hearing Testimony of Senior Homicide Prosecutor Stan Irvin during CPL § 440.10 Hearing in *People v. Tasker Spruill*, Ind. No. 13008/95, July 1998, (admitting to *Damiani* practice); Deposition of KCDA Supervising Homicide Bureau Paralegal Liza Noonan Fitzpatrick in *Collins v. City of New York* 11 CV 766 (FB) (RML), May 10, 2013, pp. 53-56 (admitting to counterfeit affirmation and office subpoena practice); KCDAO's Appellant's Brief in *People v. Tasker Spruill*, Kings Co. Ind. 13008/95, pp. 24, 26-27 (conceding that "[t]he practice in the [DA's] Office at the time was for the paralegal to sign the ADA's name on the paperwork."); Deposition of KCDA Detective-Investigator Christopher Salsarulo in *Quezada v. Brown*, 08 CV 5088 (KAM) (VVP) (E.D.N.Y.), January 19, 2012, pp. 40-41, 65-67 (admitting to abuse of material witness warrants); Deposition Transcript of Supervising

298.   The unconstitutional policies identified above in ¶ 296 (a), (b), (c), (d), (h), (i), (k), (l), and (m) in particular, were followed by HALE and applied in Cooper's case, and along with HALE's <u>intentional</u> suppression of *Brady* material (¶¶ 65-98, 125, 141-186, above),[8] and knowing use of false evidence and argument (¶¶ 131-186, above), directly caused Cooper's constitutional injuries.

299.   The existence of Hynes' policies of suppressing *Brady* material, knowingly using false or misleading evidence and argument, and improper and inflammatory summation is established by:

(a)   Sixty-four cases set forth in Exhibit C, finding prosecutors violated *Brady,* knowingly used false or misleading evidence, and made improper summation arguments,

(b)   Hynes' decision to reward most of the prosecutors who committed that misconduct rather than taking any steps to rectify it, and

(c)   The maintenance of the office-wide practice of *deceiving judges* in criminal cases with false *Damiani*, material witness, and order to produce affirmations, and failing to disclose that deception to defendants, a *Brady* violation in each of the cases in which it occurred.[9]

300.   Additionally, the KCDA recently admitted that at the time of Cooper's 1993 trial, the use of false evidence and suppression of *Brady* material were institutional failures of the

---

Detective-Investigator Stephen Bondor in *Collins v. City of New York*, 11 CV 766 (FB) (RML), November 4, 2013, p. 50 (explaining the factual representations that would be made to material witnesses); Affirmation of Monique Ferrell in Opposition to Defendant's CPL§ 440.10 Motion, Nov. 3, 2006, p. 41 (discussing the KCDA's "usual practice" of causing work release or parole to revoke the release of uncooperative former inmates); Exhibit B (KCDA riding program protocols).

[8]A "plaintiff is allowed to plead in the alternative." *Breton v. City of New York*, 404 F.Supp.3d 799, 814 (S.D.N.Y., 2019) (Koeltl, J), citing Federal Rule of Civil Procedure 8(d).

[9]*Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence undermining the State's investigation is favorable material for *Brady* purposes).

Hynes administration, and resulted in at least 25 wrongful convictions. *See* Kings County District Attorney's Office, *426 Years: An Examination of 25 Wrongful Convictions in Brooklyn*, New York, July 9, 2020, p. 14 ("Taken together, the wrongful convictions discussed here [including 13 cases prior to Cooper's November 1993 conviction] all point to *failures of the prosecution as an institution* —whether through acts of individual prosecutors, collective decisions, or *failure to train or guide prosecutors adequately*") (emphasis added); p. 60 ("In many of the cases, prosecutors … failed to disclose important relevant evidence. And in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial").[10]

301. Hynes' deliberate indifference to the violation of defendants' constitutional rights by his employees is also demonstrated by his failure to investigate, supervise, and discipline prosecutors for their pattern of violating the rights of criminal defendants through the knowing use of false evidence, suppression of evidence required to be disclosed under *Brady* and its progeny, coercion of witnesses, and false or misleading summation arguments.

302. Hynes' deliberately indifferent failure to investigate, supervise, discipline, and/or rectify his employees' violations of their *Brady* disclosure obligations, not to use false evidence and argument, and not to coerce and manufacture such false testimony, effectively encouraged those employees to do so, and created an "anything goes" atmosphere that caused such violations to continue, including those in Cooper's case.

303. In that regard, Hynes and his top lieutenants, his counsel, Dino Amoroso, his Chief of Investigations and former Chief of the Homicide Bureau Michael Vecchione, his Chief

---

[10]*See* http://www.brooklynda.org/wp-content/uploads/2020/07/KCDA_CRUReport_v4r3-FINAL.pdf (last visited July 14, 2021).

Assistant, Amy Feinstein, and numerous other ADAs and supervisors, admitted in sworn depositions in *Collins v. City of New York*, *et.*, 11 CV 766 (FB) (RML) (E.D.N.Y.), *Zahrey v. City of New York,* No. 98 Civ. 4546, 2009 WL 54495 (S.D.N.Y.), and other cases, that Hynes and the KCDA had no written *Brady* disclosure policy, no formal rules of behavior governing how cases would be prosecuted and when (if ever) discipline for misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants.

304.    While Hynes maintained an Employee Manual governing relatively minor issues such as use of office equipment and time sheets, and penalties for violating those policies, there were no written standards by which prosecutors' conduct during the course of criminal cases would be assessed for discipline, much less any possible penalty that could be imposed.

305.    The KCDA representatives above testified that the KCDA's informal disciplinary "procedure" was for Hynes himself to review all criticisms or complaints about prosecutors. They testified, under oath, that while dozens of court decisions documenting the misconduct of KCDA prosecutors were brought to Hynes' attention, Hynes failed to report the offenders to outside attorney disciplinary bodies.

306.    A list of 27 cases in the four-year period preceding Cooper's November 1993 trial that gave Hynes notice of the need to investigate, supervise, and discipline his prosecutors' and investigators' with respect to their handling of their *Brady* obligations is attached as Exhibit D, and yet the KCDA representatives testified *there was not a single instance in which Hynes directed that any internal disciplinary investigation be conducted, let alone that any discipline be imposed.*

307.     To the contrary, KCDA's personnel records establish Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such misconduct, recommended some of them for judgeships and others for awards, and otherwise ratified the misconduct by aggressively defending it even after it was exposed.

308.     When Hynes received letters from the public or public officials praising his prosecutors, Hynes *personally* wrote to the prosecutors informing them that he had received the complimentary report, and praised the prosecutors.  In contrast, when prosecutors' conduct in their handling of a criminal case was criticized , Hynes  ignored it, never investigated it, and never confronted the prosecutor about the alleged behavior.

309.     Likewise, while Hynes' complimentary letters would be included in the prosecutors' personnel files, no notation would be made about any of the complaints or evidence of the prosecutors' wrongdoing.

310.      When a court explicitly found that a prosecutor committed misconduct, no record was kept in the prosecutor's personnel file of the finding, or in a central file, making it virtually impossible to track repeat offenders or to take a prosecutors' behavior into account before transferring the prosecutor to bureaus where the consequences of such misconduct were at their highest.

311.     Despite dozens of court decisions finding prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady*, *Giglio, Rosario*, or statutorily mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, Exhibits C and D, none of the prosecutors involved were ever disciplined.

312.    The KCDA personnel files of the prosecutors in the 64 cases listed in Exhibit C where prosecutorial misconduct was found from between 1989 through 2010 reveal no documentary evidence of disciplinary action ever being taken against the prosecutors, no notations of their misconduct, and Hynes conceded in deposition testimony in the Jabbar Collins case that he took no remedial action with respect to such conduct.

313.    Moreover, prosecutors who courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

314.    Despite the 64 judicial findings of misconduct, Exhibit C, not once during Hynes' 24 years in office did he ever terminate a prosecutor for prosecutorial misconduct.

315.    Against this backdrop of the lack of a disciplinary infrastructure, Hynes kept win/loss statistics, making a prosecutor's conviction rate a key factor in his or her ability to advance their careers within the office.

316.    The above policies, customs, and practices, collectively referred to here as the "Hynes Trial Policies," caused Cooper's wrongful arrest, prosecution, and conviction.

317.    A number of cases handled by Hynes' office during the time period of Cooper's arrest and prosecution, and shortly after it,[11] illustrate how Hynes' Trial Policies condoned prosecutorial misconduct.

---

[11]*See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) (Post-incident evidence is … relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Collins v. City of New York*, 923 F.Supp.2d 462, 477 (E.D.N.Y. 2013) (Block, J.) (post-incident conduct "might … reflect a tacit policy on Hynes's part to condone whatever his subordinates deemed necessary to secure a conviction")

318.    Shortly after Hynes KCDA assumed office in 1990, he defended the wrongful conviction secured by his predecessor in the infamous Waldbaum's Supermarket Fire case in which six New York City firefighters died.   Hynes' predecessor convicted a man named Eric Jackson of the purported "arson" that killed the firefighters and convinced the court to sentence Jackson to 25 years to life.

319.    However, the trial court vacated the conviction based on the KCDA's admission that homicide prosecutor Jon Besunder suppressed *Brady* material from Jackson indicating a fire expert deemed the fire an accidental one, that the Fire Department likely fabricated the arson to ensure the fire fighters' families received greater death benefits, and that there was evidence that undercut Jackson's confession.

320.    In June 1990, the Appellate Division affirmed the trial court's decision to vacate the conviction based on Besunder's suppression of this devastating *Brady* material.

321.    Just a month after the Appellate Division's affirmance, Hynes' promoted Besunder to First Deputy Chief of the KCDA Homicide Bureau.  Besunder testified at a deposition in the Jabbar Collins case that neither Hynes nor anyone from the KCDA ever questioned him about the Jackson case, or even brought up his conduct in the case before or after promoting him.  *See* Deposition of Jon Besunder in *Collins v. City of New York*, 11 CV 766, April 19, 2013, pp. 136-137.

322.    Following the KCDA's appeal, Jackson's case was remanded for an evidentiary hearing, during which the trial court explicitly found Besunder's testimony at the hearing was "evasive and disingenuous." *People v Jackson*, 154 Misc.2d 718, 722 (Sup Ct. Kings Co. June 12, 1992).

323.     Yet even after this additional finding, Besunder was never questioned, disciplined, or sanctioned.  Instead, Besunder continued in his supervisory position and was later appointed Executive DA, training younger ADA on the Riding Program that was designed to, among other things, avoid creating a record of evidence a defendant could use to challenge his case.

324.     In February 1992, a month after Cooper was arrested, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending the murder conviction his office obtained in *People v. Russ*, 79 N.Y.2d 152 (1992).  The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then, in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred:

> [T]he prosecution interrupted Lawrence's midaftenoon testimony and obtained a continuance. Lawrence, then 17 years old, was (1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney's office; (4) interrogated and threatened with 2 to 7 years in prison; ( 5) removed to Central Booking for fingerprinting; (6) held until 5 :00 A.M. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's post-arrest and post-incarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped.  She was only then released from police custody.

79 N.Y.2d at 177.

325.     In reversing the conviction, the Court condemned the "egregious" behavior of the KCDA in "legally coercing [Lawrence's] testimony."  *Id.* (citing *Rochin v. California*, 342 U.S.

165, 172 (1952) (conduct that "shocks the conscience"). That the jury heard what had occurred and could judge the witness's credibility was "not adequate," the Court's emphasized.

326. In the 1993 Ruddy Quezada case, Quezada was convicted based on the testimony of star witness Sixto Salcedo. During trial the prosecutor portrayed Salcedo as a voluntary witness and had no reason to lie. Years later, however, Salcedo recanted his trial testimony, explaining that he had been arrested on a material witness warrant and held against his will at a hotel by the KCDA. (Civil complaint in *Quezada v. Hynes*, *et. al.*, 16 CV 6577 (MKB) (SMG) (Doc. # 1) (E.D.N.Y.), which we incorporate here and in all following paragraphs).

327. A high level appellate prosecutor scoffed at Quezada's claims, arguing they were untrue, there was absolutely no evidence to support them, and there was "no copy of a material witness order in the file." The trial prosecutor, who was by then a supervisor in the KCDA, denied any knowledge of the material witness warrant as well.

328. Years later, when a federal habeas court ordered discovery, the KCDA produced the supposedly non-existent material witness warrant and hotel custody records confirming Salcedo's account. The material witness warrant had been obtained by the very trial prosecutor who had sworn under oath that he had no knowledge of it.

329. The case was remanded to state court, and Hynes took the position that the KCDA's suppression and misrepresentations regarding the material witness warrant and hotel custody did not constitute a *Brady* violation or entitle Quezada to any relief.

330. During discovery in state court, the KCDA turned over an email establishing the appellate prosecutor who had claimed there was no material witness warrant in the file, like the trial prosecutor, had personal knowledge of the warrant long before she made her false representations.

331.    Yet Hynes neither investigated or disciplined the trial or appellate prosecutors, or acknowledged their conduct violated Quezada's right to due process.  Instead, he continued to defend their conduct and the conviction secured through their suppression.

332.    It was not until the new Kings County District Attorney, Kenneth Thompson, came into office that the KCDA finally did the right thing.   The KCDA fired the appellate prosecutor and consented to vacatur and dismissal of all charges against Quezada.[12]

333.    But the most egregious and revealing example of the Hynes Trial Policies and Hynes' indifference to such conduct is the case of Jabbar Collins.  (Civil complaint in *Collins v. City of New York, et.*, 11 CV 766 (FB) (RML) (E.D.N.Y.)(Doc # 1), which we incorporate here and in all following paragraphs.)

334.    Collins was arrested in 1994 and prosecuted in 1995, shortly after Cooper was prosecuted and convicted.

335.    In 2006, Collins brought a post-conviction motion documenting, among other misconduct, *Brady* violations, witness coercion, and the knowing presentation of false evidence and argument by prosecutor Michael Vecchione, then chief of the KCDA's Homicide Bureau, later Hynes' Chief of Investigations, Hynes' close confidante, and one of the prosecutors involved in the initial stages of Cooper's case.

336.    Rather than investigate whether Collins' allegations were true, Hynes assigned several attorneys who were direct subordinates of Vecchione and who were second seating him on several high profile cases to defend Vecchione's conduct no matter how egregious they found it to be.

---

[12]The CITY ultimately agreed to pay Quezada $9,000,0000 to settle his civil case asserting, among other things, a *Monell* claim based on Hynes' policies.

337.     These prosecutors presented in court a false sworn affirmation by Vecchione

denying the allegations which caused Collins' 440 motion to be denied. However, proceedings

in Collins' subsequent federal habeas corpus action before the Honorable Dora L. Irizarry,

*Collins v. Ercole*, 08 CV 1359 (DLI), forced the KCDA to disclose extensive *Brady* material the

KCDA had all along but had withheld from Collins. The disclosure revealed that Vecchione's

sworn affirmation, used to defeat Collins' state 440 motion, was perjurious.

338.     Yet Hynes continued to support Vecchione, declared he had done nothing wrong,

and held him out as exemplifying the qualities that served as an example to other prosecutors in

the office. Ultimately, in granting Collins' habeas petition, dismissing the underlying state

indictment, and releasing Collins from custody after 16 years of wrongful imprisonment, Judge

Irizarry condemned Hynes and the KCDA for defending the misconduct of Vecchione and other

prosecutors in this matter, and for Hynes' failure to properly train, supervise, and discipline his

staff.

339.     In the face of those egregious constitutional violations, Hynes' had his

prosecutors declare on the record during the June 8, 2010 proceeding before Judge Irizarry

(where the KCDA ultimately consented to dismissal of the charges) that:

> "This Office stands behind the conduct of former Assistant District
> Attorney Posnor and Fisconia and current Assistant District
> Attorney Vecchione, who prosecuted the defendant at his trial,
> along with the Office's staff and detective investigators who
> assisted them[.]"

340.     Within a day of the dismissal, Hynes told media representatives that Vecchione is

a "very principled lawyer," "was not guilty of any misconduct," and that he would not conduct

any investigation into Vecchione's conduct.

341.     Hynes summarily declared that Vecchione would face no disciplinary action. Hynes thereafter promoted Vecchione and continued to praise him.  Collins then brought a *Monell* action against the City based on Hynes' policies and ratification of Vecchione's misconduct.  The Honorable Frederick Block excoriated Vecchione's conduct and Hynes' failure to investigate it.  Yet even after Judge Block's condemnation, which was reported in virtually all major New York newspapers, Hynes did not even read Collins' civil complaint, 440 papers, or habeas petition to review Vecchione's conduct.  Deposition of Charles J. Hynes, *Collins v. City of New York*, 11 CV 766 (FB)(RML), December 19, 2013, p. 12.  Meanwhile, the City ultimately paid Collins $10,000,000 in damages to settle his lawsuit.

342.     Hynes' acquiescence to such misconduct as a matter of policy is also demonstrated by his failure to sanction outrageous misconduct by HALE, a Deputy Bureau Chief at the time, during the 1998 trial of Vladimir Campos, *People v Campos*, 281 A.D.2d 638, 638 (2d Dep't 2001), a potential death penalty case.  During direct examination a key witness blurted out that detectives had coerced him into making a statement incriminating Campos, and that prior to trial he had recanted his statement when meeting with HALE, and later failed a lie detector test.  The defense objected that HALE had failed to disclose any of this information and moved for a mistrial.

343.     HALE responded by arguing, in accordance with the Hynes' Trial Policies, that the witness' pretrial recantation was not *Brady* material because it was not credible.[13]

344.     When the Court asked HALE whether he "had any knowledge of the purported lie detector test," HALE falsely stated to the Court that he did not:

---

[13]Trial Transcript in *People v. Campos*, Kings Co. Ind. No. 790/98, p. 441.

> MR. HALE: No, Judge. I don't recall. I don't have anything in my file about that. The Court knows that I wasn't on this case right from the get-go. I'm not seeing anything in my files that purports to do that."

*Id.* at 442.

345. But during a hearing on the *Brady* issue two days later, the KCDA revealed that in truth, HALE himself requested the lied detector test and had personally prepared the questions. *Id.* pp. 464-465, 476-477. It was also revealed that HALE had affirmatively misstated to the defense that the witness never recanted his story. *Id.* at 494.

346. The trial court, the Honorable Carolyn Demarest, found that the pretrial recantation and polygraph test constituted *Brady* material, that HALE was "absolutely without justification" in failing to disclose it, and that HALE's false representations to the court were "prosecutorial misconduct." *Id.* 499. As a sanction, Judge Demarest struck the testimony of the witness in its entirety and gave the jury a curative instruction.

347. Despite this explicit judicial finding of HALE's misconduct, HALE was not investigated, sanctioned, disciplined, or in anyway penalized for it. HALE maintained his supervisory position in the KCDA, continued to receive promotions, including a promotion to Chief Counsel to Hynes along with a pay raise. Nor was the court's finding of misconduct placed into Hales' personnel file, preventing any successor DA from learning of Hale's misconduct.

348. The Hynes Trial Policies individually and collectively, caused, permitted, encouraged, or acquiesced in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors, detective investigators, and NYPD detectives working with the KCDA, and substantially caused HALE's misconduct at Cooper's trial and the violation of Cooper's constitutional rights.

349. The foregoing violations of Cooper's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY, amounting to affirmative policies, practices, and customs, and deliberate indifference to the constitutional rights of persons subject to prosecution by the KCDA, namely, those identified above in ¶ 296, and:

(a)     the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

   i.     the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings, including bail hearings, pretrial hearings, and trial;

   ii.    the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means;

   iii.   the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information;

   iv.    the duty to refrain from abusing court process or otherwise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses; and

(b)     the failure to adequately investigate, instruct, supervise and discipline their employees with respect to such matters, or to rectify such practices.

350. The aforesaid affirmative or *de fact*o policies, procedures, regulations, practices and/or customs were implemented or tolerated by policymaking officials for the CITY, including, but not limited to, Hynes and his delegates, who knew:

(a)     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)     that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c)     that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

351.     The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

(a)     as noted above, numerous credible allegations, many substantiated by judicial decisions, Exhibits C and D, that ADAs had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady,* had presented or failed to correct false or misleading testimony and argument, and/or had used improper summation arguments,

(b)     civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crime; and

(c)     numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, recognizing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

(d)     judicial decisions putting the KCDA on notice that the CITY could be held liable for its failure to adequately investigate, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dep't 2001), *Leka v. City of New York*, 04 CV 8784 (DAB); *Zahrey v. City of New York*, et al., 98 Civ. 4546 (DCP); *Collins v. City of New York*, 11 CV 766 (FB) (RML).

352.     Despite this knowledge, the supervisory and policymaking officers and officials of the CITY perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, investigate or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, as described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the CITY and the State of New York.

353.     The aforesaid policies, procedures, regulations, practices and/or customs of the CITY were collectively and individually a substantial factor in bringing about the violations of Cooper's rights under the Constitution and Laws of the United States and in causing his damages.

354.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates) has final managerial responsibility for instructing supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

355.     Hynes, who was the highest-ranking New York City official with responsibility for setting and enforcing policy with respect to managing his office's personnel and the functions of the office, had final policymaking authority in all such areas.

356.     Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his office's performance of its duties.

357.     Hynes at all relevant times was an elected officer of Kings County, one of the constituent counties of the CITY, and the office was and is funded out of the CITY's budget.

358.     Furthermore, Hynes, as the District Attorney, was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2) and federal *Monell* jurisprudence, *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019); and New York has provided by statute (N.Y. County Law§§ 53, 941) that the CITY's constituent counties (including Kings County), and hence the CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

359.     Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

360.     During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Cooper, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

361.     By virtue of the foregoing, the CITY is liable for having substantially caused the foregoing violations of Cooper's constitutional rights and his resultant injuries (¶ 245, above).

## SIXTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983 Claim Against the CITY Based On
the KCDA's Post-Conviction Policy And Custom Of Covering-Up
Trial Prosecutors' Suppression Of *Brady/Giglio* Material)

362.     Cooper repeats the allegations in ¶¶ 1-361, above and incorporates them here and in all following paragraphs.

363.     Hynes, through his delegated policymakers, including FOIL Appeals Officer Morgan J. Dennehy (¶¶ 397-405, below), created and implemented a plainly unconstitutional, improper, and deliberately indifferent policy, custom, or practice that was intentionally designed and functioned to cover up and perpetuate *Brady/Giglio* violations committed by KCDA trial prosecutors, and to deprive convicted defendants of their constitutional right to ongoing disclosure of *Brady/Gigilo* material suppressed during their trials ("the cover-up policy").

364.     The cover-up policy included,

(a)     Responding to convicted defendants' FOIL requests for *Brady/Giglio* material by restricting the search for such material to the limited records held in the defendants' criminal case files, despite the fact that the KCDA holds such material outside of defendants' case files (*e.g.* in the Paralegal File, Detective-Investigator Squad, Witness Relocation Unit, Crime Victims Unit, *etc.*).  The KCDA practice of limiting its search in this manner was declared illegal as early as 1996, long before Cooper made his FOIL requests to the KCDA.  *See Collins v. Hynes*, Kings  Co. Index No. 22973/96, Decision and Order, Jan. 22, 1997, pp. 7-8 (Sup. Ct., Kings Co.) (Dowd, J.) (KCDA's search "shall not be limited to respondent's case file in the underlying criminal case, but to any record" in the KCDA's possession.  The FOIL "does not limit searches to case files but to records kept by the agency"),

(b)     Summarily denying convicted defendants' FOIL requests for *Brady* and *Rosario* material when the defendants' trial files did not contain documents literally labeled  "*Brady*" or "*Rosario*" material,

notwithstanding that the records within the file were clearly such material based on their content, and such records were held outside of the defendants' trial files, another practice long ago declared illegal. *See Collins v. Hynes*, at pp. 8-9 (Dowd, J.) (rejecting KCDA's argument that a FOIL request for all *Rosario* material was insufficient under the FOIL, and ruling the KCDA was obligated to disclose all records that contained information constituting *Rosario* material as defined by CPL § 240.45),

(c)    Creating memorandums for inclusion in convicted defendants' FOIL Files to ensure the KCDA's responses to the defendants' FOIL requests are consistent with the trial prosecutors' trial narratives and did not disclose or reveal any information that was not turned over at trial (*see e.g.* Exhibit F) (KCDA Memorandum to FOIL File discussing the non-disclosure of a letter the trial prosecutor wrote to the probation department concerning a witness which a defendant specifically requested in a FOIL request, but which the KCDA falsely denied access to on the ground that the letter did not exist); and

(d)    Defending wrongful convictions once they came to light, and covering up other's misconduct.

365.    These policies functioned to cover-up *Brady/Giglio* material suppressed during Cooper's and other defendants' trials, appeals, and post-conviction challenges.

366.    For example, in April 1995 Jabbar Collins was convicted of murder and sentenced to 34 and 2/3 years to life in prison. In May 1995, Collins began making FOIL requests to the KCDA for *Brady* material concerning three key witnesses who then Homicide Bureau Chief Michael Vecchione presented at trial as Good Samaritans who testified against Collins with no undisclosed reason for doing so.

367.    From 1995 to 2008 Collins made a series of FOIL requests to the KCDA attempting to secure documentation proving the prosecutor's trial narrative regarding the witnesses was false, and that they had undisclosed motives for testifying.

368.    Yet in accordance with cover-up policy, the KCDA, denied each of those requests on the ground that the *Brady* material did not exist. When Collins brought state court lawsuits to challenge those denials, the KCDA defeated the lawsuits by affirming to the court that the

73

records Collins sought did not exist or were not in the KCDA's possession. Likewise, throughout Collins' state court appeals and post-conviction challenges, the KCDA represented the prosecution's trial narrative had been truthful, and that the prosecutor had not suppressed any *Brady* material.

369.     However, in 2010, discovery was ordered in Collins' federal habeas corpus proceeding, *Collins v. Ercole* , 08 CV 1359 (DLI) and the KCDA was forced to disclose the very *Brady/Giglio* material the KCDA had for 15 years claimed did not exist, including (a) a *Damiani* order proving a key witness refused to be produced to the KCDA but was brought there anyway, (b) records showing the witness had been a suspect in a robbery and lied to police immediately before implicating Collins in the crime, (c) a material witness order, warrant and supporting affidavit pertaining to the second witness, showing he had been uncooperative with the KCDA and had to be incarcerated for weeks and forced to testify, (d) an out-of-state material witness warrant pertaining to the third witness, showing the witness had been uncooperative with the KCDA prior to trial, (e) a New York City Probation Department memorandum to KCDA detective-investigators disclosing plans to initiate violation of probation proceedings against that witness, and (f) two letters Vecchione wrote to the New York City Department of Probation on behalf of that witness, resulting in the Probation Department forgoing violation of probation proceedings in light of the witness' cooperation.

370.     Most of these records were located in the KCDA's "Paralegal's File," which the KCDA maintained separate and apart from defendants' trial file.

371.     Shortly after revealing the above records, the KCDA consented to dismissal of Collins' indictment and his immediate release from prison.

372.    The KCDA's withholding of this *Brady* material in response to Collins' 1995 and later FOIL requests caused him to needlessly spend 15 years in prison.

373.    In May 1995 Gregory Ellis was convicted of murder and sentenced to life in prison.   The only witness implicating Ellis in the crime was a drug addict named Richard Rivera, who did not implicate Ellis in the crime until over three weeks after it took place.

374.    At trial and during summation, the prosecutor represented that when Rivera initially implicated Ellis, Rivera had no reason to do so, did not have any open cases, and had no reason for testifying against Ellis at trial.

375.    Over the course of the next 23 years Ellis made numerous FOIL requests to the KCDA for all *Brady* material in his case, including evidence that contradicted the trial narrative that Rivera was a Good Samaritan.

376.    The KCDA denied each of those requests on the ground that the *Brady* material did not exist or could not be located.   Likewise, throughout Ellis' state court appeals and post-conviction challenges, the KCDA represented Rivera had been truthful, had not committed perjury, and that the prosecutor had not suppressed any *Brady* material.

377.    Yet in 2020, a new attorney for Ellis made a FOIL request for Rivera's case file and discovered documents establishing, among other things, (a) when police initially brought Rivera to the KCDA for questioning about the murder, he had an open warrant for his arrest in an undisclosed criminal possession of a controlled substance case, faced a year in jail, and faced a possible parole violation that could have put him back in state prison for over a year, (b) after Rivera cooperated at the KCDA, prosecutors allowed him to remain at liberty without arresting or returning him on the warrant, (c) when Rivera was arrested for a new grand larceny case a year later, Ellis' prosecutor personally intervened in the case and secured Rivera, a predicate

felony offender who was still on parole, a favorable bail, and (d) after the prosecutor's intervention, the KCDA offered Rivera a favorable plea bargain.

378.   These records were located in Rivera's case file, which the KCDA never produced because the KCDA maintained these exculpatory records separate and apart from Ellis' trial file.

379.   The KCDA's withholding of this *Brady* material in response to Ellis' 1996 and later FOIL requests caused him to spend 24 years in prison.[14]

380.   In November 1998 Tasker Spruill was convicted of murder.   During his trial, the prosecutor presented Shawn Newton, the star witness against him —who was incarcerated in state prison— as a Good Samaritan who freely cooperated with the KCDA and testified voluntarily with no undisclosed incentive for doing so.

382.   Following Spruill's conviction, he filed a series of FOIL requests with the KCDA attempting to secure *Brady* material proving the prosecutor's trial narrative regarding the witness was false, and that the witness had been coerced into testifying.

383.   For the next 10 years however the KCDA denied Spruill's FOIL requests on the ground that no such material existed.  When Spruill commenced a state lawsuit to challenge the denial, the KCDA defeated it by affirming to the court that it had made a full disclosure of all available material.  *Spruill v. Hynes*, Kings County Index Number 11036/10.  Likewise, throughout Spruill's state court appeals, federal habeas challenges, and CPL § 440.10 litigation, the KCDA represented Newton never refused to meet with the prosecutor and testified voluntarily.

---

[14]Ellis' April 15, 2021, CPL § 440.10 Motion raising these *Brady/Giglio* issues is pending before the Supreme Court, Kings County.

384.    Yet 10 years later, the KCDA, faced with a subpoena duces tecum during litigation of Spruill's CPL § 440 motion, disclosed (a) 12 *Damiani* orders lacking the star witness' consent to be produced to the KCDA, (b) a *Damiani* order memorializing the witness' explicit refusal to be transferred to the KCDA to meet the prosecutor, and (c) several orders to produce, issued upon false affirmations and used to produce Newton to the KCDA over 20 times.[15]

385.    The KCDA also revealed a secret material witness order demonstrating the KCDA had custody of another witness the prosecutor had falsely represented might disappear if the court did not permit her to testify that day.

386.    These undisclosed *Damiani* orders, orders to produce, and the material witness order were maintained in the KCDA Detective-Investigators Squad, separate and apart from the defendant's trial file.

387.    On March 27, 2017, the 440 court vacated Spruill's conviction on coercion, *Brady*, and false testimony grounds, finding the records should have been disclosed to the defense.[16]

388.    The KCDA's cover-up policy in defending wrongful convictions once they came to light, and prosecutors covering up each other's misconduct, is further demonstrated by the conduct of Hynes and eight members of his executive staff once the extent of Hynes' wrongful convictions became public.

---

[15]The witness' correction records revealed that when correction officials executed one of those orders to produce, the witness attempted to kill himself in his prison cell, but was forced to be produced to the KCDA anyway.

[16]The Appellate Division reversed, concluding, among other things, that the non-disclosure was not material. *People v Spruill*, 164 A.D.3d 1270 (2d Dep't 2018).

389.     As each of those officials would admit to the New York City Conflict of Interest Board, they each violated New York City Charter § 2604, conduct constituting a Class A misdemeanor (misusing City resources),[17] in their efforts to assist Hynes in defending against attacks focused on the scores of men he wrongfully convicted.

390.     Hynes and his executives never reported each others' misconduct and violations of their oaths of office, but rather collectively took part in this outrageous conduct. Even after Hynes' executives *admitted* to committing these acts, Hynes publicly declared they "did nothing wrong."[18]

391.     The cover-up policy is also demonstrated by Executive DA, Dino Amoroso's actions in pressuring an ADA to sign a false declaration to cover-up evidence that prosecutors had been trained to suppress *Brady* material. ADA Barbara Burke was assigned to compile KCDA records responsive to the Plaintiff's discovery demands in the Jabbar Collins lawsuit.

---

[17]*R.A.C. Group v Board of Educ. of City of New York*, 21 A.D.3d 243, 247-248 (2d Dep't 2005)("A person who violates New York City Charter § 2604 is guilty of a misdemeanor, and forfeits his or her public office or employment upon conviction[.]"); Penal Law § 55.10 (2)(b) (providing any misdemeanor defined outside of that statute without specification "shall be deemed a class A misdemeanor"); P.L. § 70.15 (1) (authorizing a one year sentence for an A misdemeanor). Hynes and his executive staff each admitted in detailed stipulations to the New York City Conflict of Interest Board that between 2012-2013, they violated § 2604 of the New York City Charter by using CITY resources, time, or equipment to help Hynes in his effort to win reelection (by fending off criticism of his wrongful convictions). Hynes was fined $40,000 (the highest fine in NYC history for such conduct), Amy Feinstein, Chief Assistant District Attorney ($4,500 fine), Dino Amoroso, Deputy District Attorney ($4,500 fine), Henna White, Community Liaison to Orthodox Jewish Community ($4,000 fine), Anne Swern, First Assistant District Attorney ($2,000 fine), Lance Ogiste, Counsel to Hynes ($1,000 fine), Michael F. Vecchione, Chief of the Rackets Division ($1,000 fine), Marc Fliedner, Executive District Attorney ($800 fine), and Mary Hughes, Confidential Assistant District Attorney ($600 fine).

[18]This complimented Hynes' creation of a conviction review panel that had *the appearance* of independence, but which was really designed to whitewash Hynes' wrongful conviction scandal. Hynes appointed Robert G.M. Keating, one of Hynes' closest friends and a man he would jog with on a daily basis, to lead the supposedly "independent" review panel.

One of those demands sought any recordings and attendance sheets of a KCDA training session conducted by Michael Vecchione and the Sex Crimes Bureau Chief during which ADAs were instructed that *Brady* material that was not memorialized —sex crimes victims' pretrial denials or recantations— did not have to be disclosed to the defense.

392.     When ADA Burke raised concerns about the KCDA's failure to disclose those records, Amoroso, Hynes' close friend, demoted ADA Burke from her executive position to the KCDA's Early Case Assessment Bureau, a position typically reserved for young, inexperienced ADAs joining the office.

393.     In August 2013, shortly after that demotion, Amoroso instructed ADA Burke to execute a declaration in the Jabbar Collins case representing she had no knowledge of the training session or the attendance sheet.  After securing Burke's declaration, Hynes fired her.

394.     ADA Burke decided to speak out, and reported to the FBI that Amoroso had pressured her into signing the declaration.   In April 2014 she also wrote to Magistrate Judge Richard M. Levy, who was handling discovery in the Collins case, explaining that "Amoroso instructed [her] to sign" the misleading declaration, and revealed that the instructional DVD of the training session actually existed, as well as the attendance sheet generated in connection with the training session.  Doc #176, Docket Sheet in *Collins v. City of New York*, 11 CV 766 (FB)(RML).[19]  The CITY later disclosed the supposedly non-existent attendance sheet to the Plaintiff.

395.     Pursuant to the cover-up policy, the KCDA denied each of Cooper's FOIL requests (¶ 213) for *Brady* material suppressed throughout his criminal trial on the grounds that

---

[19]Frances Robles and Vivian Yee, *A New Dispute Emerges in Brooklyn Prosecutor's Office, New York Times*, Nov. 22, 2013, p. 21 (https://www.nytimes.com/2013/11/23/nyregion/a-new-dispute-emerges-in-brooklyn-prosecutors-office.html) (last visited June 25, 2021).

the requested material did not exist or could not be located when in fact, those records were held

by the KCDA in and outside of Cooper's trial file.

396.    The KCDA's cover-up policy prolonged Cooper's unjust loss of liberty,

continued his unjust incarceration, and deprived him of his constitutional rights to:

    (a)    Continuing disclosure of *Brady* and *Giglio* material suppressed by the State during his criminal trial, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments,

    (b)    The ongoing obligation of the State to correct material false or misleading evidence that caused the defendant's wrongful conviction in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments,

    (c)    To not be maliciously prosecuted, and to have that prosecution continued, in violation of the Fourth and Fourteenth Amendments, and

    (d)    To not be deprived of liberty as a result of the fabrication of evidence by government officers acting in an investigative capacity, in violation of the Due Process Clauses of the Fifth, Sixth and Fourteenth Amendments, *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000).

397.    At relevant times above, Hynes, and later Eric Gonzalez upon his appointment or

election, was the chief executive of the KCDA.

398.    As a matter of New York law, Hynes and Gonzalez, as the head of the KCDA,

was the FOIL Appeals Officer for the KCDA, or the individual they designated for that purpose.

*See* Public Officers Law § 89 (4) (a).

399.    The FOIL explicitly authorized Hynes and Gonzalez to designate a subordinate as

the Appeals Officer.  Public Officers Law § 89 (4) (a) (Hynes or his designee); 43 Rules of the

City of New York § 1-02 ("The head or governing body of each agency …  shall designate one

or more persons as records access officer or officers to coordinate the agency's response to public

requests for inspection and copying of records.")

400.     In or around 2001 Hynes designated Morgan J. Dennehy as the FOIL Appeals

Officer for the KCDA, who served in that role from 2001 to at least 2018.  When Gonzalez was

appointed or elected in 2016, he continued Dennehy's designation as the FOIL Appeals Officer

for the KCDA.

401.     During that time period, Dennehy established all FOIL policies, procedures, and

practices for the KCDA.[20]

402.     No CITY official had veto power over Dennehy's FOIL decisions and policies,

and they were completely insulated from further municipal review.

403.     Dennehy's policies, acts, and/or omissions, at the time they were made, for

practical and legal reasons were the CITY's final decisions on the matters to which they

pertained.  Public Officers Law § 89 (b) ("[A] person denied access to a record in an appeal

determination … may bring a proceeding for review of such denial pursuant to article seventy-

eight of the civil practice law and rules."); 43 Rules of the City of New York § 1-06 (d) (deeming

Appeals Officer's decision final and requiring him or her to inform requesters of their right to

seek judicial review of that decision).

404.     Dennehy, as the CITY official in charge of the KCDA's administration and

compliance with the FOIL, and the municipal official who had the last word and ultimate say on

the handling of FOIL requests made to the KCDA, had final policymaking authority concerning:

> (a)     Which KCDA files would be searched in response to convicted
> defendants' FOIL requests seeking access to *Brady* material, *Rosario*
> material, and other records regarding their cases,

---

[20]We have deposition testimony from Dennehy to this effect.  *See* Deposition of Morgan J.
Dennehy in *Collins v. City of New York*, 11 CV 766 (FB) (RML), July  22, 2013, pp. 41-42, 46-
47.

(b)      The procedure for reviewing and responding to convicted defendants' FOIL requests seeking such materials, and

(c)      Responding to, granting and/or denying convicted defendants' FOIL requests seeking such materials.

405.      Dennehy and/or his predecessor, exercising that policymaking authority, promulgated, established, enforced, and instructed all KCDA Records Access Officers to follow the policies discussed above, and the KCDA's Records Access Officers followed those policies, or pre-existing policies that Dennehy adopted and ratified, in denying each of Cooper's FOIL requests.

406.      The cover-up policy damaged Cooper as set forth above, including in ¶ 245.

**SEVENTH CAUSE OF ACTION**
(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on
the conduct of the NYPD)

407.      Cooper repeats the allegations in ¶¶ 1-406 of this Complaint, and incorporates them here and in all following paragraphs.

408.      The foregoing violations of Cooper's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY amounting to deliberate indifference to the constitutional rights of persons, including Cooper who are investigated, arrested, or prosecuted for alleged criminal activities.

409.      Prior to Cooper's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

(a) The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b) The determination of probable cause to make an arrest; and

(c) The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*Brady* material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

410. With respect to "a" and "c" in the preceding paragraph, prior to Cooper's 1993 arrest and prosecution, the NYPD provided no training at all.[21]

411. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the CITY, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

(a) To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

---

[21]Deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, including *Zahrey v. City of New York, et al.,* 98 Civ. 4546 (DLP) (S.D.N.Y.), establishes, prior to and during the time period of Cooper's 1993 arrest and prosecution, the NYPD provided no training concerning appropriate interrogation of accomplice or informant witnesses and *Brady* compliance. Most such witnesses had no idea what "*Brady*" was and no clue about their obligation to comply with it.

(b)     That such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

(c)     That the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

412.    The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Cooper's constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings, trial and incarceration.

413.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, and the need to investigate and supervise officers by, among other circumstances:

(a)     Credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony;

(b)     Fifty civil lawsuits, from 1992 to 2000 (Exhibit E), some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause;

(c)     Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

(d)     Judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the CITY could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady, see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison,* above;

(e)     Formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the NYC Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

(f)     The inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

414.     Evidence that the NYPD, in 1992-1993, had notice, and policies and customs of, deliberate indifference to police misconduct, including the coercion of false or misleading statements, fabrication of evidence, and withholding information favorable to the defense, is evidenced by The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), dated July 7, 1994.

415.     The Mollen Commission report, which was being compiled during the time of Cooper's arrest and prosecution, establishes that:

> In the face of th[e] problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out …. Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of

the Department's corruption controls from command
accountability and supervision, to investigations, police culture,
training, and recruitment.

For at least the past decade, the system designed to protect the
Department from corruption minimized the likelihood of
uncovering it.

Mollen Commission Report, p. 2-3.

416.     Other circumstance and government reports put the CITY on notice as well

regarding the need to investigate, discipline, and supervise its police officers:

(a)     In 1990, the Office of Special Prosecutor, which investigated charges of
police corruption, was abolished.

(b)     The Mollen Commission concluded police perjury and falsification of
official records is probably the most common form of police corruption
facing the criminal justice system:

…Regardless of the motives behind police falsifications, what is
particularly troublesome about this practice is that it is widely
tolerated by corrupt and honest officers alike, as well as their
supervisors. Corrupt and honest officers told us that their
supervisors knew or should have known about falsified versions of
searches and arrests and never questioned them,

…What breeds this tolerance is deep-rooted perception among
many officers of all ranks within the Department that nothing is
really wrong with compromising facts to fight crime in the real world.
Simply put, despite the devastating consequences of police
falsifications, there is a persistent belief among many officers that it
is necessary and justified, even if unlawful. As one dedicated officer
put it, police officers often view falsification as, to use his words,
"doing God's work" – doing whatever it takes to get a suspected
criminal off the streets.  This attitude is so entrenched, especially in
high-crime precincts, that when investigators confronted one
recently arrested officer with evidence of perjury, he asked in
disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

417.     Furthermore, since at least 1984, well before CUTRONE and his codefendants

framed Cooper in 1992, the CITY and the NYPD were on notice of the inadequacy of its

training, supervision, and discipline policies, and that police officers joining the force were disproportionately involved in the same type of misconduct and abuse as in Cooper's case. *See e.g.* Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

418. The City policymakers were on notice in 1992-1993 of the lack of supervision and discipline of NYPD officers by virtue of:

(a) The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations;

(b) Prior to July 1993, the Civilian Complaint Review Board ("CCRB"), which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the NYPD, operated as an agency of the NYPD rather than as an independent, unbiased entity;

(c) During the 1980s, the early 1990s, and in and around the time frame of the token clerk's murder investigation in Cooper's case, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases;

(d) On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received;

(e) The CCRB has also failed to recommend disciplinary action in the vast majority of its cases;

(f) On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases;

(g) Moreover, most of the complaints that are substantiated by the CCRB did not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90- day suspension;

(h) Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or

judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992;

(i)     The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994;

(j)     More than $82 million was paid in damages to victims of police misconduct in 1,352 cases between 1992 and 1995;

(k)     In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, the CITY imposed no discipline, either before or after resolution in court, almost never reopened an investigation previously conducted after such resolution, and sometimes promoted the abusive officer to a position of greater authority despite the judicial resolution; and

(l)     Former New York City Police Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."[22]

419.    The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Cooper's constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause, and continuing throughout his criminal trial, conviction, and incarceration.

420.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and

---

[22]*Accord* Amended Civil Complaint in *Negron v. City of New York*, 18 CV 6645 (DG) (RLM) (S.D.N.Y.) (Doc. # 1) at ¶¶ 213-373, incorporated here by reference (detailing numerous additional instances of police misconduct which provided the NYPD with notice of its officers misconduct, and establish the NYPD's policy of acquiescence and ratification).

prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, the use of only truthful evidence, and the disclosure of *Brady* material.

421.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority and constitutes a CITY policymaker for whom the CITY is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

422.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Cooper, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training, supervision and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects.

423.    The aforesaid policies, procedures, regulations, practices and/or customs of the CITY and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by AGAR, TARTAGLIA, and CUTRONE of Cooper's rights under the Constitution and laws of the United States.

424.    By virtue of the foregoing, the CITY is liable for Cooper's damages (¶ 245).

**EIGHTH CAUSE OF ACTION**
(*Monell*/42 U.S.C. § 1983 Claim Against the NYCTA based
on conduct of the NYCTAPD)

425.    Cooper repeats the allegations contained in ¶¶ 1- 424 of this Complaint, and incorporates them here and in all following paragraphs.

426.    From 1953 until 1994, the NYCTA employed its own police force known as the NYCTAPD.

427. The misconduct by YOUNG, CARTER, and LYONS leading to Cooper's false arrest, prosecution, and imprisonment resulted from several improper, plainly inadequate NYCTAPD customs, policies, and/or practices of those entities, including:

       (a)       The deliberate indifference by policymaking officials at the NYCTA and the NYCTAPD Chief and his delegates, with regard to the training, supervision, and disciplining of detectives and officers with regard to their obligations to investigate, arrest, and initiate the prosecutions of criminal suspects and defendants in accordance with the common law, statutes, and constitutions of the State of New York and of the United States, not to manufacture false "evidence," including statements and identifications, through coercion, suggestion, outright fabrication, or other improper means, the obligation to fully disclose to prosecutors evidence favorable to the accused pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); and

       (b)       Deliberate indifference by policymaking officials at the NYCTA and the NYCTAPD Chief and his delegates to NYCTAPD police and detectives' violation of criminal suspects' and defendants' federal and New York State statutory and constitutional rights by, among other things, false arrest, malicious prosecution, fabrication of identification and other evidence through coercive, blatantly suggestive, and other improper means, false reporting, corrupt failure to disclose *Brady* material to prosecutors, including the detectives' own misconduct, covering up misconduct, fostering and failing to take reasonable steps to alleviate the "blue wall of silence," whereby detectives would shield their own and their colleagues misconduct from discovery, and detectives' conferral of secret benefits and promises to vulnerable informants or drug-addicted witnesses to cause them to manufacture false testimony.

(collectively referred to as the "Transit Police Policies")

428. Long before Cooper's 1993 arrest and prosecution, policymaking officials at both the NYCTA and NYCTAPD had notice of and knew about the Transit Police Policies. Yet those officials ignored the foreseeable harm that would result from them, failed to do anything to meaningfully address them, failed to investigate or discipline the officers who followed the policies, and in many cases defended the ones that did.

429.     In July 1984 a report issued by the Internal Affairs Unit of the NYCTAPD sustained charges against plainclothes NYCTAPD officers, and found there were "serious irregularities and wrongful arrests on fabricated criminal charges being made by plainclothes transit police officers." *Roitman v. New York City Transit Authority*, 704 F.Supp. 346, 347–48 (E.D.N.Y. 1989) (quoting report).

430.     In a 1985 report evaluating a possible merger between NYCTAPD and the NYPD, the report cautioned that "the general and specialized legal training offered to Transit Police" was "inadequate," NYTAPD arrests "were said to be vulnerable to legal attack and routinely trivialized by prosecutors and judges," and the NYCTAPD was found to have established "no clear line of authority with respect to discipline." *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 121 (2d Cir. 1991) (quoting report).

431.     A 1987 report on the highly-publicized death of Michael Stewart in NYCTAPD custody faulted the NYCTAPD's apprehension and investigative procedures in connection with that case. *Id.* at 121.  That same year, NYCTA policymaking officials were given notice of the Police Practices and the need to investigate, supervise, and discipline after the NYCTA was sued in a class action and several other lawsuits for the false arrest by NYCTAPD officers.

432.     The class action, consolidated with four other false arrest cases, arose out of an apparent pattern of seemingly false arrests and prosecutions initiated from 1983 to 1987. *See Yeadon v. New York City Transit Authority*, 719 F.Supp. 204, 207 (S.D.N.Y. 1989).  The NYCTA ultimately settled the case in 1991 for over one million dollars.

433.     A 1988 report studying illegal arrests by transit officers found that "it was no secret that the current training in the N.Y.C. Police Academy has serious shortcomings as a

means of preparing officers for subway policing." *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d at 121 (quoting report).

434.    The report noted that 'Managers and supervisors in the TAPD are in need of specially tailored training programs focusing on police operations within the context of the transit system." *Id.* That same year two NYCTAPD officers were arrested for conspiracy to violate the constitutional rights of seven citizens by false arrest. They were convicted after a trial and their convictions and sentences upheld by the Second Circuit in 1990. *See United States v. McDermott*, 918 F.2d 319 (2d Cir. 1990).

435.    In April 1990 the NYCTA was sued in a high-profile false arrest case, which the NYCTA vigorously defended and refused to meaningfully supervise or discipline the errant officers and detectives involved in the case. *See Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d at 121.

436.    Yet despite the obvious need to investigate, supervise, and discipline revealed by the above, and to determine whether there were other NYCTAPD officers and detectives who needed to be disciplined or discharged, the NYCTAPD took no such action.

437.    To the contrary, culpable detectives received promotions, pay raises, and stayed on the force even after their misconduct was exposed.

438.    For example, even after prosecutors complained and the NYCTAPD Internal Affairs Division found that four police officers "made scores of false or improper arrests" not a single one of them was disciplined. *See* Richard Levine and Elizabeth Neuffer, *Four New York Officers Accused of Unlawful Arrests*, New York Times, November 24, 1987.

439.    Despite the author of the Internal Affairs report recommendation to bring disciplinary proceedings against the wayward officers, the NYCTAPD Deputy Inspector

instructed the author "to close the case without such a recommendation." The Chief of the NYCTAPD at the time, James Meehan, was personally briefed on the report and he too declined to impose any discipline on the officers. *Id.*

440.    One of the more egregious examples of the Police Policies in action is the infamous case of Michael Stewart, who was killed while in NYCTAPD custody after a September 1983 arrest. The death resulted in the indictment of six officers, three for perjury for lying about the facts underlying Stewart's death. After the officers were acquitted of criminal charges, then New York City Mayor Ed Koch hired a Federal Judge to determine whether any of the officers should face internal discipline.

441.    Despite the Federal Judge's report finding misconduct by the officers and recommending discipline for one of them, the NYCTA and NYCTAPD declined to pursue *any* internal disciplinary charges against the officers, and four others who were later implicated in the cover-up. Even after the NYCTA agreed to a $1.7 million wrongful death settlement with the Stewart family, not a single officer faced internal disciplinary charges.

442.    The NYCTA and NYCTPD's conduct following such an event demonstrates not only the existence of the Police Policies not to discipline for police misconduct, but the policymakers' indifference to them.[23]

_____

[23]*Grandstaff v. City of Borger,* 767 F.2d 161, 170 (5th Cir.1985) ("Following this incompetent and catastrophic performance [by police officers], there were no reprimands, no discharges, and no admissions of error .... If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do ... was not acceptable to the police chief, changes would have been made.... This reaction to so gross an abuse … says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers [committed the same type of misconduct]"); *Collins v. City of New York*, 923 F.Supp.2d 462, 477 (E.D.N.Y. 2013).

443.     Additionally, policymaking officials at the NYCTA and NYCTAPD knew that (1) their detectives had a symbiotic relationship, and worked on a day to day basis with, NYPD police and detectives for whom corruption during this time period was an institutional practice, (2) received the same deficient training as the NYPD officers at the NYPD Academy and (3) NYCTAPD detectives adopted and employed the same culture, norms, and behaviors of their NYPD counterparts, including maintaining the "blue wall of silence" concealing other officers misconduct.

444.     In that regard, the wide-spread nature of the NYPD's illegal practices during the time of Cooper's 1993 arrest and prosecution was documented in the July 1994 Mollen Report.

445.     In light of the foregoing, the NYCTA is liable for the harms (¶ 245, above) perpetrated upon Cooper by YOUNG, CARTER, and LYONS.

## NINTH CAUSE OF ACTION
(42 U.S.C. §1983 Civil Conspiracy, Concerted Action, Aiding and Abetting; AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, LYONS, and the CITY)

446.     Cooper repeats and realleges each and every allegation contained in ¶¶ 1-445 of this Complaint, and incorporates them here and in all following paragraphs.

447.     AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS all explicitly and/or implicitly corruptly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed above, and to ultimately have Cooper falsely arrested, prosecuted, convicted, and to cover-up each others' misconduct.

448.     Each defendant then committed overt acts, *as detailed above* (¶¶ 1-445) to accomplish the goal of the conspiracy, including, but not limited to (a) framing and falsely arresting and prosecuting Cooper of the murder, and (b) covering-up those actions and the *Brady/Giglio* material that undermined the case against Cooper.

449.    By virtue of the foregoing, defendants conspired to deprive Cooper of his

constitutional rights to:

>    (a)    Not to be arrested, indicted, prosecuted, detained,
>            convicted, or imprisoned based upon false, fabricated,
>            manufactured, misleading, or inherently unreliable "evidence,"
>            including the statements and testimony of witnesses who have
>            been improperly influenced, coerced, or manipulated to provide
>            such statements and testimony, in violation of the Due Process and
>            Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments
>            to the United States Constitution, *Zahrey v. Coffey*, 221 F.3d 342,
>            349 (2d Cir. 2000) (recognizing "right not to be deprived of liberty
>            as a result of the fabrication of evidence by a government officer
>            acting in an investigating capacity");

>    (b)    Not to be deprived of his liberty absent probable cause to believe
>            he has committed a crime, in violation of his rights under the
>            Fourth and Fourteenth Amendments to the United States
>            Constitution; and

>    (c)    To timely disclosure of all material evidence favorable to the
>            defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963),
>            *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny,
>            and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and
>            Fourteenth Amendments to the United States Constitution.

450.    AGAR, TARTAGLIA, YOUNG, CARTER, CUTRONE, and LYONS

committed the foregoing violations of Cooper's constitutional rights knowingly,

intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the

effect of such misconduct upon them.

451.    By reason of the foregoing, those defendants are liable to Cooper pursuant to 42

U.S.C. § 1983, for compensatory and punitive damages detailed in ¶ 245, above.

452.    The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's

deliberate indifference to, and failure to train, supervise, and discipline their employees

regarding such conduct, despite the likelihood that the failure to do so would result in the injuries

pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation

in the civil conspiracy to continue and cover-up Cooper's wrongful and malicious arrest, prosecution, and conviction. *See* ¶¶ 292-406, *infra* (*Monell* claims against the CITY).

453.     Likewise, the NYCTA is liable for these wrongs by virtue of the NYCTA Police Department Chief's deliberate indifference to, and failure to train, supervise, and discipline employees regarding, such practices despite the Chief's awareness of the likelihood that his failure to do so would result the injuries pled herein. *See* ¶¶ 425-445, *infra* (*Monell* claim against the NYCTA).

**TENTH CAUSE OF ACTION**

(Malicious Prosecution Under New York Law; All Defendants)

454.     Cooper realleges each and every allegation contained in ¶¶ 1-453 of this Complaint, and incorporates them here and in all following paragraphs.

455.     By virtue of the foregoing, AGAR, TARTAGLIA, YOUNG, CUTRONE, CARTER, and LYONS, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Cooper.

456.     The criminal proceedings terminated in Cooper's favor.

457.     There was no probable cause for the commencement or the continuation of the criminal proceedings.

458.     The Defendants acted with actual malice.

459.     Defendants the CITY and NYCTA are liable for these wrongs under the principle of *respondeat superior*, and for the damages set forth in ¶ 245, above.

## ELEVENTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress Under New York Law;
All Defendants)

460.    Cooper realleges each and every allegation contained in ¶¶ 1-459 of this

Complaint, and incorporates them here and in all following paragraphs.

461.    Defendants engaged in a continuous pattern of extreme and outrageous conduct

directed at Cooper from December 4, 1992, until his release from prison on January 9, 2020.

462.    Defendants engaged in that pattern of conduct with an intention to cause, or in

reckless disregard of the substantial probability that it would cause, Cooper severe emotional

distress.

463.    Specifically, defendants, individually, acting in concert with, conspiring with,

and/or aiding and abetting one another and other persons for whose acts they are liable, coerced

witnesses into making false statements to be used against Cooper, created false official records to

be used against Cooper, initiated or caused the initiation and continuation of false and unfounded

criminal charges against Cooper while lacking probable cause to do so, suppressed *Brady and

Giglio* material, and lied to prosecutors, courts, and the jury at Cooper's trial.

464.    As a result, Cooper suffered severe emotional distress that was proximately

caused by the defendants' conduct.

465.    By virtue of the foregoing, Cooper suffered the actual damages identified in ¶

245.

## TWELFTH CAUSE OF ACTION
### (False Arrest Under New York Law; All Defendants)

466.    Cooper realleges each and every allegation contained in ¶¶ 1-465 of this Complaint, and incorporates them here and in all following paragraphs.

467.    AGAR, TARTAGLIA, YOUNG, CUTRONE, CARTER, and LYONS intended to and in fact did, confine Cooper.

468.    Cooper was aware of his confinement.

469.    Cooper did not consent to his confinement.

470.    The confinement was not supported by probable cause or otherwise privileged.

471.    Defendants the CITY and NYCTA are liable for these wrongs under the principle of *respondeat superior*, and for the damages set forth in ¶ 245.

## THIRTEENTH CAUSE OF ACTION
### (Negligent Training and Supervision, and Discipline Under New York Law; CITY and NYCTA)

472.    Cooper realleges each and every allegation contained in ¶¶ 1-471 of this Complaint, and incorporates them here and in all following paragraphs.

473.    By virtue of the foregoing, the CITY and NYCTA are liable to Cooper because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the KCDA, NYPD, and NYCTAPD with regard to their aforementioned duties.  As such, the CITY and NYCTA are liable for the damages set forth in ¶ 245.

## FOURTEENTH CAUSE OF ACTION

(New York State Constitutional Due Process Claim Against The CITY and NYCTA Pursuant To Respondent Superior; *Buari v. City of New York*, 2021 WL 1198371 (S.D.N.Y. 2021))

474.    Cooper realleges each and every allegation contained in ¶¶ 1-473 of this Complaint, and incorporates them here and in all following paragraphs.

475.    YOUNG, CUTRONE, CARTER, and LYONS, by virtue of their acts and omissions detailed above, violated Cooper's rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against him, (c) to due process of law, (d) to a fair trial, (e) to not be convicted based on false or misleading evidence and argument, and suppression of *Brady* material, and (f) to not be incarcerated when actually innocent.

476.    As a direct and proximate result of these defendants' acts and omissions, Cooper was wrongfully arrested, prosecuted, convicted, and imprisoned for nearly 28 years, and suffered other grievous and continuing injuries set forth above.

477.    The CITY is liable under *respondeat superior* for the acts and omissions of CUTRONE, and the NYCTA for the acts of YOUNG, CARTER, and LYONS, within the scope of their employment, for Cooper's damages (¶ 245, above).

WHEREFORE, Cooper demands judgment against defendants as follows:

      a.    For compensatory damages of not less than $75,000,000;

      b.    For punitive damages against the individual defendants of $50,000,000;

      c.    For reasonable attorneys' fees, together with costs;

      d.    For pre-judgment interest as allowed by law; and

     e.     For such other and further relief as this Court may deem just and proper.

DATED:     Yonkers, New York
                July 25, 2021

*Thomas Hoffman*

_____

THOMAS HOFFMAN, ESQ.
Law Offices of Thomas Hoffman, P.C.
37 Elaine Terrace
Yonkers, New York 10701-5257
Office: (212) 581-1180
Cell: (917) 589-6156
Email: thoff93451@aol.com

*Attorney for Emmanuelle Cooper*

## TABLE OF EXHIBITS

EXHIBIT A        Certificate of Disposition in *People v. Emmanuel Cooper*, Kings Co, Ind. No. 427/93

EXHIBIT B        KCDA Riding Program Memorandum, Taking Statements From Witnesses

EXHIBIT C        List of 64 Cases Finding KCDA Prosecutors Violated *Brady,* Knowingly Used False Or Misleading Evidence, And Made Improper Summation Arguments

EXHIBIT D        List Of 27 Cases In The Four-Year Period Preceding Cooper's November 1993 Trial That Gave Hynes Notice Of The Need To Investigate, Supervise, And Discipline His Prosecutors With Respect To Their Handling Of Their *Brady* Obligations

EXHIBIT E        List Of 50 Civil Lawsuits Alleging Police Falsified, Exaggerated, Or Withheld Material Evidence And Conducted Search Or Arrests Without Probable Cause

EXHIBIT F        KCDA Memorandum to FOIL File in the Jabbar Collins Case, April 1, 1997